INDUSTRALEASE AUTOMATED & SCIENTIFIC EQUIPMENT CORPORATION, Appellant, v R. M. E. ENTERPRISES, INC., et al., Respondents.

Second Department, July 11, 1977

*Hays, St. John, Abramson & Heilbron (Edward J. Walsh, Jr.,* and *R. Victor Bernstein* of counsel), for appellant.

*Samuel W. Gilman* for respondents.

HOPKINS, J. P. The primary issue before us is whether disclaimers of express and implied warranties in a lease of industrial equipment are unconscionable under the circumstances where the equipment never operated (see Uniform Commercial Code, §§ 2-302, 2-316). A subsidiary issue is whether the Uniform Commercial Code applies to leases of equipment.

The action is brought to recover unpaid rent under the lease. The defendants-respondents denied liability and counterclaimed for damages incurred in connection with the installation of the equipment. After a jury trial, in which the court charged that the disclaimer of warranties was not unconscionable as a matter of law, a verdict in favor of the defendants was returned on the complaint and granting them judgment on their counterclaim in the principal sum of $1,342.76. The plaintiff appeals. We affirm. We hold that the Uniform Commercial Code applies to leases of equipment, and that the disclaimers of warranties were unconscionable under the circumstances.

I

The defendant R. M. E. Enterprises, Inc. (Enterprises) owned a 40-acre picnic grove in Warren, New Jersey. The operation of the grove necessarily generated considerable refuse during the season, which begins in May. Prior to the events involved in this litigation, the trash was piled in 40-foot open-top steel containers and disposed of by a rubbish collector. Enterprises was wholly owned by the defendant Max Evans who, with his wife, the defendant Irene Evans, managed the picnic grove.

Max Evans became interested in disposing of the rubbish through nonpollutant burning on the premises. He visited Farmingdale, New York, at the invitation of Clean Air Controls, Inc. (Clean Air) to inspect equipment in operation which, Clean Air informed him, would meet the requirements of Enterprises. Impressed with what he saw, he told Clean Air that he would take two units, one to be in reserve if the other broke down. Eventually, on February 24, 1971, a lease between Clean Air and Enterprises was executed, providing for 60 monthly payments of $322.58 in return for the use of the two units. The lease also contained a clause generally disclaiming any warranties, except that it preserved the warranties if the lessor were the manufacturer of the equipment.[1] As

---

1. The lease provided, in bold print: "9. Lessor makes no warranties with respect to the fitness or suitability of the Leased Property for any purpose or use or with respect to its durability. Lessee acknowledges that the Leased Property is of a size, design and capacity selected by Lessee as suitable for its purposes. Lessor makes no warranties, expressed or implied, with respect to the Leased Property other than that, if new, the standard manufacturer's warranty of new equipment is in effect and Lessor will exercise its right thereunder for the mutual benefit of Lessor and Lessee (or if Lessor be the manufacturer, it will comply with the terms and conditions of its warranty)."

Clean Air was the manufacturer of the leased equipment, under the language of the lease the usual warranties were thus in force for the benefit of Enterprises.

Thereafter, acting under instructions, Evans installed a concrete slab, underground wiring and a fuel tank. Evans testified that on May 13, 1971 (and this is not contested by the plaintiff) he was visited by a representative of Clean Air and a representative of the plaintiff who presented him with a set of new papers which "were like the other papers I signed but with a different company's name on the top", that he was told that the lease he had signed before was "no good", and that the new papers had to be signed "so we can get our money so you can get your incinerator." Evans testified that he signed the new papers, which were a lease between Enterprises and the plaintiff for the same equipment, providing for 60 monthly rental payments of $319.70, plus sales tax, and a guarantee by Max and Irene Evans of the lease. That lease contained an unqualified disclaimer of express and implied warranties.[2] It also contained an option which granted the right to Enterprises to acquire the equipment at the end of the lease by a payment to the plaintiff in the sum of $1,390.

On May 14, 1971, the next day, the incinerators were delivered and installed. Evans testified (and his testimony was not contested by the plaintiff) that they did not then or thereafter work, although he complained to both Clean Air and to the plaintiff, which tried in vain to make the equipment operative.[3] Enterprises during this period made four

---

2. The lease provided, in bold print: "2.c. (12) Representations. And Lessee does hereby agree that each unit is of a size, design, capacity, and material selected by Lessee, and that Lessee is satisfied that each such unit is suitable for Lessee's purposes, and sufficiently durable under the conditions of usage thereof by Lessee, and that Lessor has made no representations or warranties with respect to the suitability or durability of any unit for the purposes or uses of Lessee, or with respect to the permissible load thereof, or any other representation or warranty, express or implied, with respect thereto."

3. Evans gave the following testimony:

"Q Did they ever work at all?

"A They—Well, that's a very difficult question to answer, Sam. They did, in fact, burn, but we had to physically prime them with actual pouring of fuel to get them going. They said do something. And once we got them going it melted something and the stack to this day leans rather precariously and the heat caused something to break. Once we finally got them going, the heat caused it to break and the stack leaned. We put out the fire, but they never worked; no, sir.

"Q Did Clean Air or Industralease, or both of them send people up there to look at it?

"A Oh, it was a daily shuttle between Farmingdale and Warren Township.

rental payments to the plaintiff. By letters dated September 16, 1971 and December 30, 1971, Enterprises demanded the removal of the incinerators from its premises, but the plaintiff did not accede and required the continuance of the monthly payments.

This litigation then ensued.

## II

The plaintiff's complaint sought $17,936.76, representing the balance of the payments due under the lease, together with the sum of $2,500 for legal expenses. The defendants denied liability, claiming that the plaintiff had breached its warranty that the equipment was properly constructed, free of operational defects, and capable of meeting the need of disposing of the rubbish accumulated as the result of its business; and the defendants counterclaimed in addition for the sum of $5,000, alleged to have been incurred as expenses by them in installing the equipment and attempting to make it function properly.

At the trial the court held that the disclaimer of warranties

---

"Q Starting when? "A Well, on the 14th, when they were delivered, they had a whole crew there.

"Q And how frequently thereafter?

"A Oh, golly, it was almost every day, you know, barring, you know, weekends, Sunday, whatever, or a day when they said they had to get a part and wouldn't be back for two days, you know. But if it wasn't for something of that nature, they would be there every day. They brought different experts.

"Q Did there come a time when you told somebody in connection with Industralease to get that junk off your property? .

"A Oh, several occasions I verbally told them what to do with their machinery * * *

"THE COURT: Let me ask you something. There came a time you said these pieces of equipment, when they came, were defective in that they never worked.

"THE WITNESS: Yes, your Honor, that's correct.

"THE COURT: And they continued in that condition. Did you notify Clean Air about it?

"THE WITNESS: They knew, sir, because they did the actual—Clean Air did the actual hooking up, the electric—

"THE COURT: This continued for a number of days thereafter?

"THE WITNESS: Yes, sir.

"THE COURT: Now, while they were still servicing, did you do anything with respect to notification to anybody?

"THE WITNESS: Oh, yes, sir, daily.

"THE COURT: What did you do?

"THE WITNESS: Daily phone calls, But again, sir, they were there every day, because they were desperately trying to start that."

contained in the lease was not unconscionable as a matter of law. The court left to the jury the determination of the issue whether the plaintiff had made express warranties concerning the capacity of the incinerators to function properly, instructing the jury that if in fact the warranties had been made, and the incinerators had not worked properly, the plaintiff had breached its contract.

The jury returned a verdict on the complaint in favor of the defendants and awarded the defendants $1,342.76 on their counterclaim.

## III

The first issue which must be decided is whether the Uniform Commercial Code and the express and implied warranties which it provides apply to a lease of equipment. We think that they do.

In *Hoisting Engine Sales Co. v Hart* (237 NY 30, 37) the defendant leased from the plaintiff a hoist and traveler, which failed to operate. The Court of Appeals refused to consider whether the hiring of a chattel should be assimilated to the sale of goods under the Personal Property Law then in effect (Personal Property Law, former § 96), but held that at common law the owner of a chattel for hire was under an obligation to ascertain that the chattel was reasonably fit for the purpose expressly stated, or for the intended use of which he should have been aware (see, also, *Matter of Casualty Co. of Amer. [Bliss Co. Claim]*, 250 NY 410, 417). Later cases confirm the existence of such an implied warranty based on the common law, without reliance on the Uniform Commercial Code *(Vander Veer v Tyrrell,* 29 AD2d 255, 259; *Atlantic Tug & Equip. Co. v S & L Paving Corp.,* 40 AD2d 589, 590; cf. Farnsworth, Implied Warranties of Quality in Non-Sales Cases, 57 Col L Rev 653, 655-660; Murray, Under the Spreading Analogy of Article 2 of the Uniform Commercial Code, 39 Fordham L Rev 447, 453).

Several cases have suggested the application of the Uniform Commercial Code to the leasing of chattels *(Hertz Commercial Leasing Corp. v Transportation Credit Clearing House,* 59 Misc 2d 226, revd on other grounds, 64 Misc 2d 910; *Owens v Patent Scaffolding Co. Div. of Harsco,* 77 Misc 2d 992, revd 50 AD2d 866; *United States Leasing Corp. v Franklin Plaza Apts.,* 65 Misc 2d 1082). Our decision in *Owens v Patent Scaffolding Co. (supra)* is not dispositive of the question. There

we simply held that the broadening application of warranties in the rental of equipment was irrelevant to the issue whether the transaction was subject to the six-year Statute of Limitations prescribed by CPLR 213 (subd 2) or, rather, the four-year Statute of Limitations prescribed by section 2-725 of the Uniform Commercial Code.

Section 2-102 of the Uniform Commercial Code provides that "[u]nless the context otherwise requires, this Article applies to transactions in goods", thereafter making it clear that it does not apply to a contract intended as a security transaction. The nature of the contract between the plaintiff and Enterprises precludes its characterization as a security transaction. In our view the transaction, though cast in form as a lease, assumed the true model of a sale. The testimony of Evans established that Enterprises was not financially able to purchase the equipment outright. Though the plaintiff and Clean Air, for their own reasons, chose to put the transaction in the form of a lease, quite clearly their intent, and Enterprises' intent as well, was the sale of the equipment for a price payable over a period of five years in monthly installments, with a small balance due at the end of the period, upon the payment of which, at the option of Enterprises, the equipment would be owned by Enterprises. The lease was one in name only (see 1 Williston, Sales [4th ed, Squillante & Fonseca], § 11-12, pp 511-515; cf. *Sawyer v Pioneer Leasing Corp.,* 244 Ark 943; *Redfern Meats v Hertz Corp.,* 134 Ga App 381; *All-States Leasing Co. v Bass,* 96 Idaho 873; *Jones v Keetch,* 388 Mich 164).

Because of the nature of the transaction, therefore, the rights of the parties are governed by the provisions of the Uniform Commercial Code.

## IV

The Uniform Commercial Code plainly recognizes the validity of disclaimers of warranties in sales agreements under certain circumstances (Uniform Commercial Code, § 2-316). Here, pursuant to the statute, the exclusion of warranties was accomplished by conspicuous and bold print and thus complied with the statute in that respect. The question whether in this case the disclaimer is unconscionable remains.

The defendants had raised the issue of unconscionability at the trial. Trial Term held that the disclaimer was not unconscionable, but submitted to the jury the issues whether the

plaintiff had made express warranties concerning the capacity and operating ability of the incinerators and whether the warranties had been breached by the plaintiff. The submission of these issues was, however, in direct conflict with the language of the disclaimer, which excluded reliance by the defendant on any such warranties. Hence, a reversal of the judgment must be directed, unless, on examination of the facts and the language of the disclaimer, we conclude that the disclaimer is unenforceable because of its unconscionability, in which event the issues of the making of express warranties and their breach would survive and hence were properly submitted to the jury. We turn, accordingly, to the question whether under the circumstances of this case the disclaimer is unconscionable.

Section 2-302 of the Uniform Commercial Code provides that the court may refuse to enforce a contract clause once it finds the clause to have been unconscionable at the time it was made. The determination of unconscionability is a matter of law for the court to decide *(Zicari v Harris Co.,* 33 AD2d 17, 24), and thus subject to our review. The Official Comment to section 2-302 states that it "is intended to allow the court to pass directly on the unconscionability of the contract or particular clause therein and to make a conclusion of law as to its unconscionability", and that "[t]he basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract." (McKinney's Cons Law of NY, Book 62½, Part 1, p 193.) The term "unconscionable" is thus flexible, to be applied within the framework of the transaction under scrutiny, and considered in the light of the commercial climate then existing and the common law.

Though unconscionability, as an element in the enforcement of contracts, is equitable in origin, there is evidence to sustain the conclusion that the common-law courts as well were moved by the doctrine to invalidate contracts under certain circumstances (1 Corbin Contracts, § 128, p 551). The original concept was broad: An unconscionable contract was one "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other" *(Earl of Chesterfield v Janssen,* 2 Ves Sen 125, 155, 28 Eng Reprint 82, 100; cf. *Hume v United States,* 132 US

406, 411). The test has been more sharply defined "to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party", and characterized "by a gross inequality of bargaining power" *(Williams v Walker-Thomas Furniture Co.,* 350 F2d 445, 449). In dealing with the doctrine, commentators have differentiated between procedural and substantive unconscionability (see, e.g., Eddy, On the "Essential" Purposes of Limited Remedies: The Metaphysics of UCC Section 2-719(2), 65 Cal L Rev 28, 42-50).[4] We need not treat that distinction here, for we think that components of both aspects are present. Moreover, in considering the question, we have put aside the cases holding disclaimers of warranties invalid as against public policy in which damages arising from personal injuries were sought to be recovered (cf. *Sarfati v Hittner & Sons,* 35 AD2d 1004, affd 30 NY2d 613; *Velez v Craine & Clark Lbr. Corp.,* 33 NY2d 117, 124-125; *Henningsen v Bloomfield Motors,* 32 NJ 358), for we think different considerations are there present (cf. *Seely v White Motor Co.,* 63 Cal 2d 9).

We must begin the examination of the facts underlying the contract with the awareness that "[p]arties to a contract are given broad latitude within which to fashion their own remedies for breach of contract" *(Wilson Trading Corp. v David Ferguson, Ltd.,* 23 NY2d 398, 403), and that under the Uniform Commercial Code "the obligations of good faith, diligence, reasonableness and care prescribed by this Act may not be disclaimed" (Uniform Commercial Code, § 1-102, subd [3]; cf. *Matter of Kiamie,* 309 NY 325). Here the evidence is that shortly before the incinerators were to be delivered, the defendants were told that the contract in existence between themselves and Clean Air could not be performed for not clearly communicated reasons, and that a new contract had to be executed to insure delivery of the equipment. The new contract eliminated the warranties which the Clean Air contract had preserved, since Clean Air was the manufacturer of the equipment. The atmosphere of haste and pressure on the defendants is clearly pervasive. In addition, at this point of

---

4. Procedural unconscionability in general is involved with the contract formation process, and focuses on high pressures exerted on the parties, fine print of the contract, misrepresentation, or unequal bargaining position. Substantive unconscionability, on the other hand, is involved with the content of the terms of the contract per se, such as inflated prices, unfair disclaimers or termination clauses (see *Nu Dimension Figure Salons v Becerra,* 73 Misc 2d 140, 143).

the bargaining, with the beginning of the season for the defendants' operations at hand, the defendants were clearly at a disadvantage to bargain further and, indeed, did not profess to understand the size and mechanism of the equipment which would satisfy their needs.

Thus, the defendants did not pretend to have equal expertise in the field; they had dealt with Clean Air as purchasers seeking a means to meet a necessity arising in the business, and Clean Air undertook to design and build equipment to achieve the desired result. The interposition of the plaintiff in the transaction served only the purpose of Clean Air and not of the defendants.

Although the statute prescribes that we are to determine unconscionability as of the time of the making of the contract (Uniform Commercial Code, § 2-302), we cannot divorce entirely the events which occur later. In this case, the evidence plainly establishes that the equipment did not work at all, that it achieved none of the purposes of the parties. This is a result so "one-sided", in the words of the authors of the Official Comment to the Uniform Commercial Code, that the disclaimer in good conscience should not be enforced.[5] In effect the equipment was worthless (see *Vlases v Montgomery Ward & Co.,* 377 F2d 846, 850).

We therefore hold that the disclaimer of warranties is unconscionable under the circumstances and may not be enforced.

## V

We thus conclude that as the jury found that the plaintiff had made express warranties to the defendants concerning the incinerators and that the warranties had been breached, the judgment should be affirmed.

MARTUSCELLO, LATHAM and DAMIANI, JJ., concur.

Judgment of the Supreme Court, Nassau County, entered November 3, 1975, affirmed, with costs.

---

5. There is no issue of failure of consideration or revocation of acceptance raised by the briefs of the parties (cf. Uniform Commercial Code, § 2-607, subd [3]; *Overland Bond & Inv. Corp. v Howard,* 9 Ill App 3d 348; *Zabriskie Chevrolet v Smith,* 99 NJ Super 441; 6 Corbin, Contracts, §§ 1256-1257) and we have consequently not dealt with these issues.