**In re O.P.M. LEASING SERVICES, Debtor.**

**Bankruptcy Nos. 81 B 10533, 81 B 11203, 81 B 11749, 81 B 11850 and 83 B 10776 (BRL).**

United States Bankruptcy Court, S.D. New York.

June 19, 1986.

Zalkin, Rodin & Goodman, New York City by Andrew Gottfried, Menachem O. Zelmanovitz, Neil E. Herman, for trustee.

Davis & Hockenberg, Des Moines, Iowa by Mark Walz, for Lockheed.

## DECISION AND ORDER DENYING LOCKHEED'S CLAIM FOR ATTORNEYS' FEES AND EXPENSES

BURTON R. LIFLAND, Bankruptcy Judge.

Lockheed Corporation ("Lockheed"), in Claim Number M52100, seeks $195,463.09 in attorneys' fees and expenses from the debtor, O.P.M. Leasing Services, Inc. ("O.P.M."). Lockheed incurred these fees defending a suit in Iowa brought by a third party, Steel Warehousing Inc. ("Steel"). Steel had instituted that suit to quiet title to certain computer equipment it purchased from O.P.M. and to which Lockheed also claimed title. Lockheed argues that because O.P.M. allegedly breached express and implied warranties of title under the New York Uniform Commercial Code ("N.Y.U.C.C.") and general contract principles it is entitled to recovery. James P. Hassett, the Trustee for O.P.M. ("Trustee"), objects to Lockheed's claim and contends that it should be expunged.

### I. FACTS

O.P.M. is in the business of buying, selling and leasing new and used computers and related equipment. On March 11, 1981, it filed its Chapter 11 petition for reorganization under the Bankruptcy Reform Act of 1978 ("Code"). The O.P.M. filing was "precipitated by discovery and newspaper reports that O.P.M. had served as the vehicle for a massive lease fraud exceeding $100 million." Report of the Trustee Concerning Fraud and Other Misconduct in the Management of the Affairs of the Debtor at 2 (1983). The principals of

O.P.M. were convicted and sentenced to lengthy prison terms as a result of their participation in the fraud and other misconduct in the management of O.P.M.'s affairs.

On March 24, 1981, this court directed the United States Trustee to appoint a trustee for O.P.M. Three days later, James P. Hassett was appointed Trustee. He assumed the responsibility of directing the business operations of O.P.M., conducting an investigation of O.P.M.'s past financial affairs, and pursuing various claims available to the O.P.M. estate; he has worked towards insuring the largest recovery for all creditors and has reviewed the claims filed in these proceedings. The Trustee has objected to the claim for fees and expenses filed by Lockheed. Because the Lockheed-O.P.M. history is relevant to the present inquiry, it is set forth in detail.

On June 28, 1978, O.P.M. entered into a Master Lease with Lockheed, and agreed to lease certain computer equipment to Lockheed. As was typical in all O.P.M. transactions, the parties agreed to supplement the Master Lease with various Equipment Schedules ("Schedules") which described the precise equipment to be leased. *See In re O.P.M. Leasing Services, Inc. (Hassett v. Revlon)*, 23 B.R. 104, 108 (Bankr.S.D.N.Y.1982) (discussion of interplay between Master Lease and Schedules). Schedule No. 7 ("Schedule 7") was signed by Lockheed and O.P.M. on September 18, 1980 and involved the lease of certain International Business Machines ("IBM") equipment.

Although the Master Lease and Schedule 7 contemplated O.P.M. being the lessor and Lockheed the lessee of the equipment, intermediate transactions were required to move the parties into this alignment. Lockheed, not O.P.M., was to purchase the equipment directly from IBM and then resell it to O.P.M. In turn, O.P.M. would lease the equipment back to Lockheed in a typical sale leaseback transaction. The

sale leaseback aspect of the transaction is reflected in an October 17, 1980 letter from O.P.M. requesting Lockheed to execute and return a Lockheed-O.P.M. purchase agreement and a bill of sale in which Lockheed warranted that the equipment was free and clear of all liens. Paragraph 2 of the letter states: "[K]indly have this Purchase Agreement executed and returned to ... O.P.M. *in escrow* so that we can complete the sale leaseback and equity transaction on October 27, 1980" (emphasis added).

On October 21,[1] 1980, Lockheed completed the initial step in the contemplated transaction by purchasing the equipment from IBM ("IBM-Lockheed purchase agreement") for $2,365,000. Lockheed agreed to pay $591,250 as a cash down payment upon installation of the equipment, and monthly installments of $54,290, inclusive of finance charges until IBM was paid in full. In order to secure payment of the purchase price, IBM retained a purchase money security interest in the equipment ("IBM lien").

On October 27, 1980, the Lockheed-O.P.M. purchase agreement was also signed by O.P.M., and the agreement with the attached bill of sale was formally executed. O.P.M. agreed to purchase the equipment for $2,365,000, the same amount Lockheed had agreed to pay. The payment terms were identical to those in the Lockheed-IBM transaction and O.P.M. assumed the obligation to pay the cash down payment upon installation of the equipment and the monthly payments thereafter. With the execution of these documents, the groundwork was laid to achieve the parties' primary objective, the leaseback of the equipment by O.P.M. to Lockheed pursuant to the Master Lease and Schedule 7.

As a result of these transactions, O.P.M. held title to the equipment which it leased to Lockheed as lessee. However, O.P.M.'s title was not the clear title represented in the various documents because it was sub-

---

1. It is not clear when the IBM-Lockheed purchase agreement was actually signed because it is undated. O.P.M. makes reference to an October 21st date in its brief, while Lockheed in one of its letters mentions an October 27th date. Nevertheless the date this agreement was signed does not impact on this court's holding.

ject to the IBM lien which had attached when Lockheed initially purchased the equipment from IBM. The IBM lien is not evidenced in any of the Lockheed-O.P.M. documents because Lockheed executed an unconditional bill of sale, which is attached as Exhibit B to the Lockheed-OPM purchase agreement. In this bill of sale, Lockheed states:

> Seller [Lockheed] hereby expressly represents and warrants that on the date hereof (i) [Lockheed] has good and marketable title to the Equipment, free and clear of any liens, claims and encumbrances whatsoever and [Lockheed] will defend said title; (ii) [Lockheed] has conveyed to Buyer [O.P.M.], and [O.P.M.] has acquired, good and marketable title to the Equipment, *free and clear of any liens, claims and encumbrances whatsoever;* (iii) [Lockheed] has full right, power and authority to convey the equipment, to Buyer; and (iv) the representations and warranties of [Lockheed] contained in Section 5(a) of the Purchase Agreement, dated October [27], 1980 (the "Purchase Agreement") between [Lockheed] and [O.P.M.] are true, correct and complete as of the date hereof.

(emphasis added). On October 27, 1980 when all of these documents were executed and were released from escrow, the IBM lien was valid and Lockheed knew or should have known that the bill of sale was inaccurate.

Although apparently unknown to Lockheed, but not in violation of any of the lease provisions, O.P.M. sold the equipment, subject both to the Lockheed lease and to the IBM lien, to Starfire Leasing Corporation ("Starfire") on October 27, 1980 for $2,476,750. Starfire contemporaneously sold the equipment, subject also to the Lockheed lease and the IBM lien, for

$2,483,250 to Steel, which purchased the equipment to obtain its tax benefits. Steel in turn leased the equipment back to O.P.M. on October 27, 1980. Steel thus held title to the equipment and leased it to O.P.M. subject to the aforementioned interests. Lockheed was the ultimate lessee of the equipment.

After the equipment was installed pursuant to the terms of the Lockheed-IBM purchase agreement, Lockheed paid the required down payment. However, O.P.M. never reimbursed Lockheed and never made any of the required monthly payments to IBM. On March 6, 1981, Lockheed wrote to O.P.M., stating that O.P.M. had breached the Lockheed-O.P.M. purchase agreement, and that since Lockheed had complied with all conditions precedent to payment by O.P.M., Lockheed was excused from any further performance under the Lockheed-O.P.M. agreements. By sending this letter and deeming its agreements with O.P.M. terminated, Lockheed considered itself excused from Section 11 of the Master Lease. That section, known as the "hell and high water" clause, required Lockheed to perform regardless of any breach by O.P.M.[2]

Lockheed "mitigated" its damages by entering into a separate agreement with IBM for the purchase of the equipment on an installment payment basis. Pursuant to this new arrangement with IBM, Lockheed paid IBM in full. The equipment remained in Lockheed's possession and Lockheed believed itself to be the title holder.

Nevertheless, pursuant to the chain of documents signed by the parties on October 27, 1980, Steel had a colorable claim as title holder of the equipment, and commenced an action against Lockheed and other defendants in the United States Dis-

---

**2.** Section 11 states:

> *No Offset, etc.*
>
> Lessee [Lockheed] shall not, for any reason, be entitled to or claim any abatement of rent or of any amounts payable under any Equipment Schedule by [Lockheed] and all such payments of rent and other amounts shall be paid by [Lockheed] to [O.P.M.] or its assignee, as the case may be, without offset, deduction, counterclaim, interruption or deferment. [Lockheed's] obligations under each Equipment Schedule shall be absolute, and shall continue in full force and effect regardless of any disability of [Lockheed] to use the Equipment or any part thereof because of any reason whatsoever, or any breach of any of the terms of any Equipment Schedule by [O.P.M.] or [Lockheed].

trict Court for the Southern District of Iowa ("Iowa Action") seeking, *inter alia,* to quiet title to the equipment. Steel sought only to protect the title and accompanying tax benefits that it believed it had purchased from Starfire; it did not seek possession of the equipment. In its answer to Steel's complaint, Lockheed asserted that it had title to the equipment, subject to the IBM lien, and that Steel had no interest whatsoever in the equipment.

After three years of discovery and pretrial litigation, Lockheed settled its disputes with Steel for what it termed a "sizeable sum." Transcript, Jan. 30, 1986, at 18. The issues raised in the Iowa suit, specifically the issue of title to the equipment, were never determined on the merits. Lockheed spent $185,463.09 in legal fees and approximately $10,000.00 in out-of-pocket expenditures for a total of $195,-463.09 defending the Iowa Action. Lockheed, in filing a claim against the O.P.M. estate, now seeks to recover these fees and expenses.

## II. CONTENTIONS OF THE PARTIES

Lockheed presents a panoply of arguments in support of its claim for attorneys' fees and expenses which are rooted in alleged breaches of express and implied warranties of title. Lockheed "[n]ote[s] that Article 2 of the New York Uniform Commercial Code would apply to the lease dispute rather than an outright sale" (citations omitted). Lockheed Brief at 3. Although Lockheed initially fails to elaborate on this contention and later offers sparse case support, it cites the express and implied warranty sections of the N.Y.U.C.C., and argues that O.P.M.'s failure to make the cash down payment and subsequent monthly payments to IBM constituted a breach of these warranties as well as those contained in Schedule 7 and the Master Lease. "But for" O.P.M.'s omission to pay, Lockheed contends that it would not have had to defend its title to the equipment. Lockheed claims that the fees and expenses incurred in the Iowa suit were proximately caused by O.P.M.'s breach of warranty of title, and therefore are recoverable from O.P.M.'s estate under the N.Y. U.C.C. and general principles of contract

law, namely the exception to the American Rule of damages.

O.P.M. disputes the applicability of Article 2 of the N.Y.U.C.C. to the particular lease transaction in question because the sale of goods, it claims, is not involved. O.P.M. further contends that the express and implied warranties contained in Schedule 7 and the Master Lease were not breached, and even if they were, Lockheed assumed the risk by choosing to "mitigate" its damages as it did. O.P.M. argues that the fees and expenses sought by Lockheed from the estate are not authorized by the Code, the U.C.C. or general principles of contract law. It further argues that the American Rule of damages prevents recovery by Lockheed, and that it does not fit within the exceptions to the Rule.

For the reasons which follow, this court finds that Lockheed is not entitled to the fees and expenses it incurred in the third party Iowa Action from the O.P.M. estate, and therefore disallows Lockheed's claim.

## III. DISCUSSION OF LAW

### A. Lockheed is Precluded from Recovering Its Attorneys' Fees and Expenses.

Under the so-called American Rule of damages, the prevailing party in litigation is precluded from recovering attorneys' fees and litigation expenses from the losing party unless statutory or contractual authority explicitly provides for such recovery. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975) ("prevailing litigant is ordinarily not entitled to collect a reasonable attorney's fee from the loser"); *Demsey & Associates Inc. v. S.S. Sea Star,* 500 F.2d 409, 411 (2d Cir.1974) ("in the absence of [statutory] or contractual authorization, attorney's fees are not generally recoverable either as part of costs or of damages"); *Artvale, Inc. v. Rugby Fabrics Corp.,* 232 F.Supp. 814, 825–26 (S.D.N.Y.1964), *aff'd,* 363 F.2d 1002 (2d Cir.1966) (same); *Rosano's Farm Store, Inc. v. Int'l Collection Service Inc.,* 115 A.D.2d 195, 195, 495 N.Y.S.2d 264, 265 (1985) (same); *Central Trust Co., Rochester v. Goldman,* 70 A.D.2d 767, 767–68, 417 N.Y.S.2d 359, 361, *appeal dismissed,*

47 N.Y.2d 1008, 420 N.Y.S.2d 221, 394 N.E.2d 290 (1979) (same). A narrow well-established exception to the rule exists which allows a party to recover the reasonable value of the attorney's fees incurred in bringing or defending an action against a *third party* as a result of a breach of contract by the other party. *Artvale*, 232 F.Supp. at 825–26 ("where a breach of contract has caused a party to maintain or defend a suit against a *third person*, the courts have permitted the recovery against the contract breacher of counsel fees and other litigation expenses incurred in the prior suit involving the third party") (emphasis in original); *Southern National Bank v. Crateo, Inc.*, 458 F.2d 688, 696 (5th Cir.1972) (same); *Wilshire Oil Co. of Texas v. Riffe*, 409 F.2d 1277, 1285 (10th Cir.1969) (same); *In re Emergency Beacon Corp.*, 48 B.R. 341, 351 (Bankr.S.D.N.Y. 1985) (same); *Doyle v. Allstate Insurance Co.*, 1 N.Y.2d 439, 444, 154 N.Y.S.2d 10, 14, 136 N.E.2d 484, 487 (1956) (attorneys' fees are recoverable as a direct result of the breach of contract by defendant to indemnify plaintiff).

Lockheed realizes that it is precluded from recovery under the American rule. It contends, however, that the narrower exception to the rule, which it claims allows it to recover fees incurred in the third party Steel litigation from O.P.M., applies. Lockheed also claims that statutory authority exists which entitles Lockheed to recover. However, an analysis of Lockheed's claims shows that Lockheed neither falls within the exception nor cites any applicable statutory authority.

1. Lockheed is Not Entitled to Fees and Expenses under the Exception to the American Rule.

■ The exception to the American Rule is set forth in the Restatement of Contracts as follows:

If a breach of contract is the cause of litigation between the plaintiff and third parties that the defendant had reason to forsee when the contract was made, the plaintiff's reasonable expenditures in such litigation are included in estimating his damages.

Restatement (First) of Contracts § 334 (1932). *See also Southern National Bank*, 458 F.2d at 697 ("it must be shown that the litigation with the [third party] was proximately caused by [defendant's] breach"); *Wilshire Oil Co. of Texas*, 409 F.2d at 1285 ("where a party was involved in previous litigation with others because of some wrongful act of the defendant, reasonable compensation for expenses attributable to the former suit is recoverable where such expenses are the natural consequences of the defendant's wrongful act"). *See generally* 25 C.J.S. Damages § 50(e) (1966). In order to recover under this exception, Lockheed would have to show, first, that O.P.M.'s breach of contract was the direct or proximate cause of the resulting litigation between Lockheed and Steel, and, second, that O.P.M. had reason to foresee this third party or collateral litigation with Steel when the Lockheed-O.P.M. contract was entered into. Finally, if Lockheed succeeded in demonstrating proximate cause and foreseeability, it still would have to show that the fees and expenses incurred were reasonable.[3] Lockheed contends that O.P.M.'s breaches "consisted of its breach of its obligation to make payments under the purchase contract, its failure to comply with its express and implied warranties and its breach of the escrow terms under which the signed but undated Bill of Sale was returned to O.P.M." Lockheed Reply Brief at 4. This court finds Lockheed's arguments unpersuasive.

■ First, O.P.M.'s breach in failing to make payments under the Lockheed-O.P.M.

---

**3.** When litigation is either settled by the parties or decided by a court on the merits, the reasonableness of the fees and expenses, given the facts and circumstances of the case, are considered in determining whether they should be allowed. *Verhagen v. Platt*, 1 N.J. 85, 61 A.2d 892, 895 (1948). Because this court finds that Lockheed was unsuccessful in demonstrating proximate cause and forseeability, it is unnecessary to address the reasonableness issue. This court notes, however, that the facts of this case make the need for and reasonableness of the fees and expenses incurred highly questionable.

purchase agreement did not directly result or proximately cause the third party Steel action. This collateral litigation involved a title dispute to the equipment which was caused by Lockheed's unilateral declaration that it was excused from any further performance and its subsequent negotiation of a separate deal with IBM. In so doing, it ignored its duty to pay rent under the Master Lease's "hell and high water" clause. This court has previously "given full force and effect as a matter of law" to an identical "hell and high water clause." *In re O.P.M. Leasing Services, Inc.*, 21 B.R. 993, 1005 (Bankr.S.D.N.Y.1982). In mitigating its damages by entering into a separate contract with IBM, Lockheed assumed the risks attendant to the fact that O.P.M. had the right to and in fact did resell the equipment and ignored the possibility that title might rest elsewhere.

Consequently, O.P.M. had no reason to forsee the Iowa action when Lockheed and O.P.M. originally contracted, *especially since Lockheed had provided O.P.M. with a clean bill of sale.* While Lockheed correctly points out that the bill of sale was originally placed in escrow, it was released from escrow on October 27, 1980 when the documents relating to the Lockheed-O.P.M. purchase agreement were executed. Thus no breach of the escrow occurred and the subsequent transfers of title were made possible in large part by Lockheed sending a clean bill of sale into the stream of commerce. It was forseeable to Lockheed that O.P.M. would sell the equipment to others. Moreover, O.P.M. breached neither its express nor implied warranties of title. Lockheed had continuous possession of the equipment and its quiet enjoyment and peaceful possession of the equipment was never disturbed.

This court finds that Lockheed does not fall within the exception to the American Rule and therefore a determination of whether the fees and expenses incurred by Lockheed were reasonable is unnecessary.

### 2. Statutory Authority Does Not Support Lockheed's Claim for Reimbursement of Fees and Expenses.

If explicit statutory authority existed which allowed Lockheed to recover its fees and expenses, Lockheed could be reimbursed. *See Alyeska Pipeline Service Co.*, 421 U.S. at 247, 95 S.Ct. at 1612; *Demsey & Associates, Inc.*, 500 F.2d at 411; *Artvale*, 232 F.Supp. at 825–26; *Rosano's Farm Store, Inc.*, 115 A.D.2d at 195, 495 N.Y.S.2d at 265. Lockheed claims that such authority exists, and asserts that the provisions of Article Two of the N.Y.U.C.C. governing breach of express and implied warranties apply to O.P.M.'s alleged breaches of the provisions of the Master Lease and Schedule 7.[4]

■ Article Two "applies to transactions in goods," not leases. *See* N.Y.U.C.C. § 2–102 (McKinney 1964). Because this court finds that the Master Lease and Schedule 7 constitute true leases which are not analogous to sales, Article Two is inapplicable. This court has previously discussed in *In re O.P.M. Leasing Services, Inc. (Hassett v. Revlon)*, 23 B.R. 104 (Bankr.S.D.N.Y.1982) the lessor-lessee relationship which the Master Lease and accompanying Schedules created and stated that "from the clear wording of the Master Lease it is evident that no security interest was ever intended." *Id.* at 116 (footnote omitted). Nonetheless, Lockheed makes the argument that "[t]he factors to be weighed in making a determination of whether a document denominated a lease is in fact a sales agreement, indicate that this case is distinguishable from the facts of the *Revlon* [O.P.M.] case." Lockheed Reply Brief at 9. This unsubstantiated assertion is plainly inaccurate. Moreover, the two cases cited by Lockheed, *Hertz Commercial Leasing Corp. v. Transportation Credit Clearing House*, 59 Misc.2d 226, 298 N.Y.S.2d 392 (Civ.Ct.N.Y.Co.1969), *rev'd on other grounds*, 64 Misc.2d 910,

---

**4.** The provisions of the N.Y.U.C.C. are cited, because the parties selected New York law to govern their contractual disputes. *See* Master

Lease § 19.5 and Lockheed-O.P.M. Purchase Agreement ¶ 6(e).

316 N.Y.S.2d 585 (1970) and *Barco Auto Leasing Corp. v. PSI Cosmetics, Inc. and AMC Renault Corp.*, 125 Misc.2d 68, 478 N.Y.S.2d 505 (Civ.Ct.N.Y.Co.1984), do not support Lockheed's arguments. In *Hertz Commercial Leasing Corp.*, the court found that the terms of a five year lease for equipment appeared to equal the cost price of the equipment plus interest. 59 Misc.2d at 228–29, 298 N.Y.S.2d at 395. Furthermore, upon expiration of the lease, the lessee was obligated to return the equipment at its expense or renew the lease for a nominal sum. Given these lease attributes, the court held that the lease was a sale and that the provisions of Article Two applied. Similarly, in *Barco Auto Leasing Corp.*, the court examined the lease transaction itself. Finding "no significant economic difference between full title ownership and the instant lease," 125 Misc.2d at 74, 478 N.Y.S.2d at 511, the court in *Barco* applied Article Two. *See also Laudisio v. Amoco Oil Co.*, 108 Misc.2d 245, 248–49, 437 N.Y.S.2d 502, 505 (Sup.Ct.N.Y.Co.1981) ("transfer of the equipment ... must be regarded in the context of the whole transaction between the parties").

In the present case an analysis of the whole transaction demonstrates that a lease and not a sale was intended. New York law considers the intentions of the parties in ascertaining whether a transaction is a sale governed by Article Two. *Industralease Automated & Scientific Equipment Corp. v. R.M.E. Enterprises, Inc.*, 58 A.D.2d 482, 487, 396 N.Y.S.2d 427, 430 (1977). The Master Lease and Schedule 7 denominate O.P.M. as "lessor" and Lockheed as "lessee" and clearly evidence the parties' intentions to enter into a lease transaction. All payments by Lockheed to O.P.M. are designated rent. While the casting of a transaction in a certain light is not determinative, *see Industralease* 58 A.D.2d at 487, 396 N.Y.S.2d at 430, the substance of the documents underlying the Lockheed-O.P.M. transaction leads to the inescapable conclusion that a lease and not a sale was contemplated. Paragraph 5.1 of the Master Lease and paragraph 4 of Schedule 7 specifically provide that each equipment schedule conveys no more than a leasehold interest to Lockheed and that O.P.M. has purposely elected not to consider Lockheed as a purchaser of the computer equipment. *See Uniflex, Inc. v. Olivetti Corp. of America*, 86 A.D.2d 538, 539, 445 N.Y.S.2d 993, 995 (1982); *Industralease* 58 A.D.2d at 487, 396 N.Y.S.2d at 430; *Hertz Commercial Leasing Corp.*, 59 Misc.2d at 228–29, 298 N.Y.S.2d at 395. O.P.M. expressly retained the right to assign the lease and to grant a security interest in the lease or the equipment without Lockheed's prior consent. The Master Lease contained no option to purchase the equipment, and Lockheed was required to return the equipment to O.P.M. upon expiration of the lease unless Lockheed elected to exercise its option to extend. Generally, when a renewal clause provides for more than a nominal rent payment, a lease rather than a sale is indicated. *Uniflex*, 86 A.D.2d at 539, 445 N.Y.S.2d at 995. The rent payments Lockheed would have been obligated to make had it chosen to renew the lease would have been roughly equivalent to rent payments reflecting reductions due mainly to depreciation of the equipment. These rental payments would certainly not be considered nominal under *Uniflex*.

Because O.P.M. retained the indicia of ownership in the equipment and Lockheed had only a leasehold interest, this court finds that the Master Lease and Schedule 7 were intended to be and are in fact leases. Article Two is inapplicable directly or even by analogy, and Lockheed's arguments that certain sections of the N.Y.U.C.C. provide statutory authority for recovery fail.

3. Even if Article Two was Applicable, It Does Not Provide the Necessary Statutory Authority for Recovery by Lockheed.

Lockheed argues that § 2–714 of the N.Y.U.C.C. provides the necessary remedy for recovery from O.P.M.'s alleged breaches of warranty of title and quiet possession. In particular, Lockheed cites § 2–714(3) which states "[i]n a proper case

any *incidental and consequential damages* under the next section may also be recovered" (emphasis added). N.Y.U.C.C. § 2–714(3) (McKinney 1964). Lockheed neglects to mention subsection (1) which provides the context for awarding damages and states:

> [w]here the buyer has accepted goods and given notification ... he may recover as *damages for any non-conformity of tender* the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(emphasis added). N.Y.U.C.C. § 2–714(1) (McKinney 1964). In the present case, Lockheed has not argued either that tender was non-conforming or that non-conforming goods were involved. Absent a showing of any non-conformity of tender, there can be no recovery under § 2–714.

Moreover, Lockheed's fees and expenses could not have been recovered under these sections because they are not considered part of incidental or consequential damages. *Artvale*, 232 F.Supp. at 825–26 (attorney's fees not recoverable as general or special damages); *Central Trust Co., Rochester v. Goldman*, 70 A.D.2d at 767–68, 417 N.Y.S.2d at 361 (same); *Neri v. Retail Marine Corp.*, 30 N.Y.2d 393, 401, 334 N.Y.S.2d 165, 171, 285 N.E.2d 311, 315 (1972) (attorneys' fees are not recoverable as incidental damages).

Lockheed's broad based assertions that O.P.M. breached express and implied warranties which somehow bring it within the ambit of § 2–714 and accompanying § 2–715 are inaccurate. O.P.M.'s breach never disturbed Lockheed's possessory interest in or its quiet enjoyment of the equipment. Hence O.P.M. did not breach, as alleged by Lockheed, section 4.2 of the Master Lease which provides, in pertinent part, that:

> Lessor [O.P.M.] warrants to Lessee [Lockheed] that, as long as [Lockheed] shall not be in default of any of the

provisions of any equipment Schedule, [O.P.M.] will not take any action to disturb [Lockheed's] unrestricted use thereof for its intended purpose. *LESSOR MAKES NO OTHER WARRANTY, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER....*

O.P.M. took no action to disturb Lockheed's use and enjoyment of the equipment. Indeed, Lockheed's use and enjoyment was not disturbed despite O.P.M.'s failure to pay.

Moreover, Lockheed's contention that O.P.M. breached implied warranties under § 2–312(1) and (2) of the N.Y.U.C.C. is incorrect. Section 2–312 provides that every contract for sale contains an implied seller's warranty that the title conveyed is good and that the goods delivered are free from any encumbrances other than those known to the buyer at the time the contract was entered into. N.Y.U.C.C. § 2–312 (McKinney 1964). It seems incredible that O.P.M. could have violated any warranty of title when these documents work no transfer of title to Lockheed in the Master Lease or Schedule 7.[5] Furthermore, O.P.M. disclaimed all express and implied warranties with regard to the equipment.

## IV. CONCLUSION

For the above reasons, this court finds that Lockheed is not entitled to recover those fees and expenses incurred in the collateral Steel litigation from the O.P.M. estate. Therefore, Lockheed's claim is disallowed and shall be expunged.

It is SO ORDERED.

---

**5.** Indeed, breaches of title warranty could only have occurred either when IBM sold the equipment to Lockheed or when Lockheed sold the equipment to O.P.M. No one has claimed any warranty of title breaches in these transactions. If anyone breached a warranty of title, it was Lockheed when it issued a clean bill of sale to O.P.M.