Richard J. MICHELS, Appellant,

v.

DYNA–KOTE INDUSTRIES, INC., and
Shelley R. Remmel, Appellees.

No. 06A01–8603–CV–71.

Court of Appeals of Indiana,
First District.

Sept. 16, 1986.

Rehearing Denied Nov. 21, 1986.

Ronald A. Wright, Maribell G. Harlow, Harlow & Wright, P.C., Indianapolis, for appellant.

Lante K. Earnest, Dean T. Barnhard, Klineman, Rose, Wolf and Wallack, Indianapolis, for appellees.

NEAL, Judge.

## STATEMENT OF THE CASE

Defendant-appellant, Richard J. Michels (Michels), appeals the decision of the Boone Circuit Court which granted a preliminary injunction in favor of plaintiff-appellee, Dyna-Kote Industries, Inc. (Dyna-Kote).

We reverse.

## STATEMENT OF THE FACTS

When Michels was a sales representative for Diamond Kote in 1980, he was sent to train the employees of Frank G. Murphy (Murphy) in the application of its chemical products. Murphy had been trying to formulate and produce chemical products of his own in a separate business he had formed. When Murphy encountered problems with his chemical formulations, he asked Michels to "bail him out." Michels had experience in development of chemical formulas and had been in the rustproofing manufacturing business earlier in his career. Through negotiations over a period of time, Michels and Murphy formed Dyna-Kote. The company's product line included rustproof products, paint sealants, fabric guards, removers, and undercoat products to be sold in the automobile after-market. The company sold products under both the Dyna-Kote label and under private labels, and all products sold under the Dyna-Kote label were warranted.

Michels was hired as president, elected as a director, and became a shareholder. Michels' rights and duties are outlined in his two-year employment contract with Dyna-Kote, which he signed on October 28, 1981. The clauses relevant to this dispute are as follows:

"1. Michels is hereby employed as President, and shall be primarily responsible for product development and for quality control for the mixing of chemicals and chemical products by the Company.

. . . . .

5. ... Michels' principal duties shall be to supervise the mixing and blending of the various products offered by the Company, ...

6. Upon starting as an employee of the Company, Michels shall provide records for the Company of all formulas of the products made or blended by the Company, together with the instructions as to the proper methods of mixing and disbursing such products in order to assure quality control thereof."

When Michels started performing under his contract with Dyna-Kote, he reduced his formulas to commercial application. He then turned over to Murphy, a director, a written record of the formulas which were placed in a lock box at the bank. Thereafter, Dyna-Kote went into production using the formulas Michels brought to the company, and Michels supervised the mixing, batching, and blending of the formulas. At some point during the entire duration of Michels' employment with Dyna-Kote, there was evidence that one of the formulas was refined, and new formulas were developed, some of which were marketed.

As president, Michels had a confidentiality agreement drafted protecting the formulas and their mixing instructions, and he required many of his subordinates to sign the agreement. There was conflict in the evidence as to whether Michels himself had ever signed this agreement, but no finding was made by the trial court indicating that he had.

Michels continued in his capacity as president of Dyna-Kote well beyond his two-year contract of employment and without executing a new one. Without notice, Michels tendered a letter of resignation as president and director of Dyna-Kote on November 19, 1985. With Michels gone,

Dyna-Kote alleges he took with him both the formulas and confidential customer information which constitute the company's trade secrets. Dyna-Kote claims it does not have adequate records to continue proper mixing of its upgraded and new products, which jeopardizes its warranties. It also seeks to prevent Michels, who was instrumental in developing customer relations for Dyna-Kote, from using this confidential information in soliciting business for himself after leaving Dyna-Kote.

Following a hearing on Dyna-Kote's motion for a preliminary injunction, the trial court ordered the following:

"1. [Michels is] hereby ORDERED to disclose and otherwise turnover [sic] and deliver to Dyna-Kote all formulas, batching and blending instructions describing or in any way related to Dyna-Kote's present, former and contemplated products (including those developed but not marketed) and other such information as [he] may possess within seven days.

2. [Michels is] hereby ORDERED to not use this information in any way, directly or indirectly, or to divulge all or any part of this information to any person or entity other than Dyna-Kote and its duly authorized representatives.

3. [Michels is] hereby ORDERED to not contact any present Dyna-Kote private label customers ... for the purposes of marketing, merchandising, or sales of any products which directly or indirectly compete with Dyna-Kote's products."

### ISSUE

Our determination of the following issue is dispositive of this cause:

Did the trial court abuse its discretion in granting a preliminary injunction?

### DISCUSSION AND DECISION

To grant or deny a preliminary injunction is within the sound discretion of the trial court, and our review is limited to a determination of whether the trial court abused its discretion. *Harvest Insurance Agency, Inc. v. Inter-Ocean Insurance Co.* (1986), Ind., 492 N.E.2d 686; *College Life Insur-* ance Co. of America v. Austin (1984), Ind. App., 466 N.E.2d 738; *Steenhoven v. College Life Insurance Co. of America* (1984), Ind.App., 458 N.E.2d 661, 460 N.E.2d 973, *trans. denied.* In analyzing this determination, our review focuses on the trial court's findings of fact which must be made even in the absence of a specific request. Ind.Rules of Procedure, Trial Rule 52(A)(1). We look to the adequacy of these findings to determine whether they are sufficient to disclose and support the legal judgment reached and whether they are supported by evidence of probative value. *Austin, supra; Steenhoven,* 458 N.E.2d 661. The trial court's findings of fact will not be set aside unless they are clearly erroneous. *See* T.R. 52(A). If the trial court's findings are determined to be clearly erroneous, it follows then that we must conclude the trial court abused its discretion in ruling on the request for preliminary injunction. *Austin, supra; Steenhoven,* 458 N.E.2d 661.

When exercising its discretion in granting a preliminary injunction, the trial court must find that the party seeking injunctive relief had met its burden in showing each of the following particulars:

"(1) its remedies at law were inadequate, thus causing irreparable harm pending resolution of the substantive action; (2) it had at least a reasonable likelihood of success at trial by establishing a *prima facie* case; (3) its threatened injury outweighed the potential harm to appellant resulting from the granting of an injunction; and (4) the public interest would not be disserved."

*Harvest Insurance Agency, supra* at 688. *See Austin, supra; Steenhoven,* 458 N.E.2d 661.

Dyna-Kote originally sought injunctive relief under Indiana's Uniform Trade Secrets Act, IND.CODE 24–2–3, requesting that Michels turn over the formulas and mixing instructions to the company, and that Michels be prevented from using the company's confidential customer list information. Formulas and their mixing in-

structions can be properly classified as "trade secrets" under appropriate circumstances as defined under IND.CODE 24–2–3–2. Depending on the facts of the case, customer lists may also be interpreted under the Act as to be classified as trade secrets. *See Kozuch v. Cra-mar Video Center, Inc.* (1985), Ind.App., 478 N.E.2d 110, *trans. denied, but cf. Steenhoven*, 458 N.E.2d 661 and *on rehearing*, 460 N.E.2d 973, *trans. denied*. However, IND.CODE 24–2–3–1(c) also provides: "This chapter displaces all conflicting law of this state pertaining to the misappropriation of trade secrets, *except contract law....*" (Our emphasis.) In the case at bar, Michels' employment contract with Dyna-Kote governs the relationship of the parties and their respective interests in the formulas and customer lists.

*Formulas*

There is no dispute that Michels owned fully-developed chemical formulas for productive use prior to Dyna-Kote's formation. Michels was approached by Murphy, and was asked by Murphy to "bail him out" in his own attempt to develop marketable chemical formulas. Murphy and Michels conferred for several months planning the formation of Dyna-Kote, its employment structure, and Michels' employment contract.

■ In construing Michels' rights and duties under his contract, we interpret the contract in accordance with the intent of the parties at the time the contract was formed. *Keystone Square Shopping Center Co. v. Marsh Supermarkets, Inc.* (1984), Ind.App., 459 N.E.2d 420, *trans. denied*. The written contract is presumed to embody all prior negotiations and agreements between the parties. *Id.* We do not look outside an unambiguous contract, but to the extent an instrument is ambiguous we may consider the situation of the parties, their motives in dealing with each other, and the object sought to be accomplished in determining the intent of the parties. *Torres v. Meyer Paving Co.* (1981), Ind.App., 423 N.E.2d 692, *trans.*

*denied.* Dyna-Kote alleges an ambiguity in that paragraph 6 of the contract quoted above imposes a continuing obligation on the part of Michels to furnish to the company any chemical formulas used or developed. Michels counters by arguing the provision requires him to disclose formulas to the company only "upon starting as an employee" and "in order to assure quality control."

■ To the extent there is an ambiguity in the contract, the intent of the parties, based on negotiations leading up to the final written contract, is clearly evident. In an original draft of an employment contract presented to Michels, it contained the following provision imposing a continuing obligation on Michels to furnish records of chemical formulas:

"6. During the term of his employment, Michels shall cause records to be prepared for the Company of all formulas of the chemical products made or blended by the Company, together with instructions as to the proper methods of mixing and disbursing such products in order to assure quality control thereof."

Michels specifically rejected this provision. Both the accepted provision and the rejected provision require Michels to only provide or cause records to be prepared for the company of all formulas. Michels was to do this "upon starting as an employee" and not "during the term of his employment" as the rejected draft provided. The contract does not contain any express assignment of the formulas evincing an intent that they should belong to Dyna-Kote. *See Pape v. Lathrop* (1897), 18 Ind.App. 633, 46 N.E. 154; 43A C.J.S. *Injunctions* Sec. 152 (1978). Michels was not paid any additional consideration by Dyna-Kote for the formulas, nor was there any provision which provided that employment itself was to be in consideration for the formulas. *See Woodward Insurance Inc. v. White* (1982), Ind., 437 N.E.2d 59; *Miller v. Ortman* (1956), 235 Ind. 641, 136 N.E.2d 17; *Donahue v. Permacel Tape Corp.* (1955), 234 Ind. 398, 127 N.E.2d 235; *Westervelt v. National Paper and Supply Co.* (1900), 154 Ind. 673,

57 N.E. 552. Since we must strictly construe the provisions of the contract against Dyna-Kote, *Steenhoven*, 458 N.E.2d 661; *English Coal Co. v. Durcholz* (1981), Ind. App., 422 N.E.2d 302, *trans. denied*, we hold that there was no express contract giving ownership of the formulas in Dyna-Kote or imposing a continuing duty on Michels to allow Dyna-Kote to use his formulas.

Nevertheless, the trial court, in its Conclusions of Law, ruled the formulas to be the exclusive property of Dyna-Kote:

"2. All of the formulas Michels originally delivered to Dyna-Kote, together with the refinements thereof, and all the formulas developed by him during his tenure with Dyna-Kote, whether marketed or not, plus all the techniques necessary to property [sic] produce Dyna-Kote's products (including but not limited to mixing and batching instructions) are the sole and exclusive property of Dyna-Kote. *Westervelt v. National Paper Supply Co.*, 154 Ind. 673, 57 N.E. 552 (1900). Further, Michels cannot dispute Dyna-Kote's ownership of these formulas. 6 I.L.E., Corporations, Sec. 151, p. 553."

Dyna-Kote claims that the contract itself created an express assignment of the formulas, but we have concluded otherwise. It also claims that it acquired ownership in the formulas implicitly by operation of law. However, reliance by the trial court and Dyna-Kote on the trial court's above quoted authorities is misplaced.

Both Dyna-Kote and the trial court rely heavily on *Westervelt, supra,* in concluding Dyna-Kote is the sole and exclusive owner of the formulas. However, in that case there was an understanding and agreement between the employee and employer that the employee's ideas, inventions and discoveries concerning the development of a proposed machine should belong to the employer, and the employee was paid additional compensation over and above his weekly wage for his ideas and inventions. These facts put the employee on notice at the time of his employment that such ideas and inventions were to belong to his employer. This case and the others cited by Dyna-Kote do not refute the rule that the terms of a contract covering the subject of employee inventions will control the allocation of proprietary rights between the parties.

Also, 6 I.L.E. *Corporations* Sec. 151, at 553 (1958) is cited for the proposition that "a director or managing officer cannot lawfully acquire any interest in property adverse to that of the corporation, nor can he dispute the title or possession of the corporation." The error in the application of this statement of the law is that the corporation, Dyna-Kote, never owned the formulas in which Michels could acquire an adverse interest. Michels always owned the formulas, and he never lost ownership of them, but merely gave the company the right to use them. Likewise, Dyna-Kote's argument that Michels breached his fiduciary duties as officer, director, and shareholder is unpersuasive. Dyna-Kote and the trial court both relied on *Hartung v. Architects Hartung/Olde/Burke, Inc.* (1973), 157 Ind.App. 546, 301 N.E.2d 240, *trans. denied.* However, this case notes the critical factor giving rise to such a duty should be the relationship expected by the principals to exist between themselves and the corporation as well as each other, and requires the fiduciary to deal fairly, honestly, and openly with his corporation and fellow stockholders. There is no contention that Michels did not deal fairly, honestly, and openly when negotiating his employment contract, which governs the interests and relationships which should be expected by the parties involved as to both ownership of formulas and subsequent competition.

Dyna-Kote also argues it implicitly acquired an ownership interest in the formulas based on several factors. It claims, and the trial court found, that pursuant to his employment contract and as president, Michels refined the initial formulas and developed new products, only some of which were marketed. It also claims that Michels made representations to third parties that the formulas are Dyna-Kote's, which is inconsistent with his claims of ownership and

are admissions which prove the trade secret status in Dyna-Kote.

▮ Regarding Dyna-Kote's interest in any upgraded or new formulas, it is true that an employer may acquire a license or shop right in the use of an employee invention when it is shown the employee expended his employer's time, tools, and materials. 12 I.L.E. *Employment* Sec. 32 (1959). However, there is no finding by the trial court, nor does the record disclose, that any changed or new formula was developed on company time using company resources or whether Michels developed them on his own time. *See Fort Wayne, Cincinnati and Louisville Railroad Co. v. Haberkorn* (1896), 15 Ind.App. 479, 44 N.E. 322. We note that, assuming arguendo, if the refined formulas, or new formulas, belonged to Dyna-Kote, such are not identified in the record and we cannot separate them. Furthermore, the contract does not specifically state that Michels was hired to invent. He was hired as president, and responsible for product development and quality control in mixing and blending the chemical products. Michels' contract included substantial bonus incentives to develop market sales, but he did not receive additional compensation or incentives to invent products for the company. In this regard, responsibility for "product development" would mean several things: it could mean invent new formulas, it could mean take the formulas brought to the company and reduce them to commercial application, or it could mean develop the products in the marketplace. Michels rejected the provision which would have imposed a continuing obligation on him to furnish records of the formulas to the company. We must construe the contract as a whole, *Keystone Square Shopping Center Co., supra,* and against the employer, Dyna-Kote, who made the contract. *Steenhoven,* 458 N.E.2d 661; *Durcholz, supra.* In either event, the circumstances here would not vest exclusive ownership of the formulas in Dyna-Kote as concluded by the trial court.

▮ Regarding Michels' representations to third parties, such representations do not refute the terms of an express contract. Dyna-Kote's additional claims are merely an attempt to imply terms to a contract which already expresses the intent of the parties. Dyna-Kote asks us to imply terms to this contract which it was unable to do by itself through direct negotiations with Michels and which are inconsistent with his contract. We will not let the Uniform Trade Secrets Act work as a subterfuge to enable Dyna-Kote to do indirectly what it could not do (and agreed not to do) directly.

The very heart of the business of Dyna-Kote was the formulas. Thus, ownership of the formulas would seem to us to be paramount in the contractual relationship. Nevertheless, while elaborate contracts were drawn, extraordinarily, there was no clause or sentence in them which provided that the property rights in and to the formulas were to be transferred from Michels to Dyna-Kote. Had that been the intent of the parties, it would have been a simple matter to insert a clause to the effect that the formulas would become the property of Dyna-Kote. Significantly, the parties did not. Even more significantly, Michels rejected a clause which would have made details of the formulas available. Now, belatedly, Dyna-Kote seizes upon Delphic utterances, oral and written, and urges us to translate them into contract clauses transferring the property right in the formulas to it when it chose not to insert such clauses in the contract in the first place. We decline. These were businessmen. We presume they knew what they wanted and drew their contracts accordingly. We will not improvise one.

*Customer Lists*

Dyna-Kote's claims that Michels took confidential information comprising customer lists must also fail because of the intent of the parties at the time of the contract. Therefore, we need not decide whether, under the facts of this case, the customer list information constitutes a trade secret.

Again, under Dyna-Kote's original employment contract offered to Michels, it tried to include the following provision:

"7. During the term of this Agreement and for one year thereafter, Michaels [sic] shall not compete with the Company in the sale of any products being sold by the Company, nor shall he represent any company, corporation or partnership, in making sales of similar products to customers of the Company, or in the areas in which the Company has been selling its products. Michaels [sic] shall not reveal any trade secrets of the Company during the course of his employment of anytime thereafter."

Michels rejected this provision, and there is no similar provision in the final contract to which both parties agreed.

Dyna-Kote again tries to use the Uniform Trade Secrets Act to do indirectly which it could not do directly. As was noted in *Steenhoven*, 460 N.E.2d at 975 n. 7:

"The real thrust of appellee's argument is not that Steenhoven disclosed College Life's customer list (at least as concerns his limited knowledge thereof), but rather, that Steenhoven used such list to benefit economically. College Life seemingly seeks not to protect a trade secret, but rather, to prevent competition by its former agent. Insofar as College Life attempts to merely restrain Steenhoven's competition, we believe the Uniform Trade Secrets Act to be an improper vehicle therefor. The fact that Steenhoven possesses certain knowledge acquired within the course of his employment does not mandate that, upon his departure, Steenhoven must wipe clean the slate of his memory. Rather, it is clear from the language of the act that the Uniform Trade Secrets Act was promulgated by the legislature to prevent the abusive and destructive usurpation of certain economically-imbued business knowledge commonly referred to as trade secrets. We do not believe the legislature ever intended the statute's provisions to act as a blanket *post facto* restraint on trade. If College Life had desired to prevent competition by its former agents based upon the agents' acquired knowledge, it could have done so contractually via the provisions of a covenant not to compete. Having forgone that possibility, we believe it misguided to attempt to stem such competition by arguing, in essence, that properly-acquired knowledge of the employer's business is automatically made a trade secret pursuant to the act, without regard to the nature of the information, simply because it can be compiled into a table or a list."

*See Fleming Sales Co. v. Bailey* (D.C.Ill. 1985), 611 F.Supp. 507.

Both the trial court and Dyna-Kote use the fact that Michels had his subordinates sign a confidentiality agreement, which included a covenant not to compete, in concluding Michels is estopped to challenge the trade secret status of the information, citing *In re Uniservices, Inc.* (7th Cir. 1975), 517 F.2d 492. In that case Dudenhoffer, a corporate officer of Crystal Industrial Services, Inc. (Crystal), never had a written employment agreement, but required employees to sign a confidentiality agreement. In 1966, Dudenhoffer and his family sold the assets of Crystal including "trade routes, covenants and agreements" which amounted to trade secrets. *Id.* at 496. Dudenhoffer's employment was terminated by a trustee in bankruptcy in 1972, and he refused to sign an agreement not to compete with Crystal. The court concluded there was no error by the district court which implied a limited covenant not to compete with Crystal protecting the purchaser's confidential information for a period of two years. In a similar case, *Pickett v. Pelican Service Associates* (1985), Ind. App., 481 N.E.2d 1113, *trans. denied*, a noncompetition agreement was also an integral part of the sale of a business and was held to be a sufficiently protectable interest.

█ The facts in the case at bar are distinguishable. Most important is the fact that Michels and Dyna-Kote agreed that his employment contract should not contain a

covenant not to compete. Michels did make his subordinates sign a confidentiality agreement, but there was never a sale of the customer information as a trade secret asset. It was not alleged that Michels disclosed Dyna-Kote's customer information; Dyna-Kote sought to prevent Michels from using this information for his own economic benefit. Michels is also in the same business and always was. There was no showing that he did not previously know the same customers or that he did not do business with them before. To imply a covenant not to compete would be contrary to the express agreement.

We conclude the decisions of the trial court are clearly erroneous; therefore, the preliminary injunction issued was an abuse of discretion. Because of its contract with Michels, Dyna-Kote did not establish a prima facie case which could entitle it to the relief sought.

Judgment Reversed.

ROBERTSON, P.J., concurs.

RATLIFF, J., concurs in result.