**MARTIN RISPENS & SON and Petoseed Company, Inc., Appellant–Defendants,**

v.

**HALL FARMS, INC., Appellee–Plaintiff.**

**No. 14A01–9201–CV–00007.**

Court of Appeals of Indiana, First District.

Oct. 28, 1992.

Michael Rosiello, Stanley C. Fickle, Jan M. Carroll, Barnes & Thornburg, Indianapolis, for appellant-defendants.

Paul B. Ledford, Vincennes, Stephen L. Williams, Mann, Chaney, Johnson, Goodwin & Williams, Terre Haute, for appellee-plaintiff.

BAKER, Judge.

Mark Hall has grown melons for 40 years, but in all his days he had never seen the likes of the disease which ravaged his 261 acre watermelon crop in 1989. Dubbed "watermelon fruit blotch," the disease—previously unknown in Indiana—destroyed

much of Hall Farms's crop and allegedly cost it nearly $180,000 in lost profits, not to mention the damaged growing equipment and lost good will. Hall is the executive vice-president of plaintiff-appellee Hall Farms, Inc., which blames defendant-appellant Martin Rispens & Sons, a seed dealer, and defendant-appellant Petoseed Company, Inc., a seed producer, for selling allegedly defective watermelon seeds. Rispens and Petoseed challenge the trial court's refusal to grant summary judgment in their favor.

### Undisputed Facts

Hall Farms, Inc.,[1] farms about 1,400 acres of mostly rented land in Knox County, Indiana. It produces grain, row crops, hay, watermelons, and cantaloupes and raises a few hogs and cows. In 1989, Hall Farms employed between 116 and 170 people; that year's watermelon and cantaloupe crop generated some $440,000 in gross revenues, despite the fruit blotch. Much of Hall Farms's past success in the melon market is attributable to the Prince Charles variety watermelon seed, known for its high yield and resistance to disease. Hall Farms had used the variety since 1982 or 1983.

In August of 1988, Hall Farms ordered 40 pounds of Prince Charles seeds from Rispens at a cost of $85.40 per pound. As requested, Rispens delivered the seeds, packaged in sealed one pound cans, in February 1989. Hall Farms stored the unopened cans until early April, at which time the watermelon seeds were germinated in two greenhouses.

On April 25th Mark Hall noticed that about 15 seedlings were spotted with small, yellow lesions. Suspecting gummy stem blight, a seed borne disease, Hall contacted a neighbor who, in turn, contacted Dr. Richard Latin, a plant pathologist from Purdue University. After transporting samples to the Purdue laboratory, Dr. Latin concluded the problem was neither gummy stem blight nor any fungus.

The lesions did not affect the plants' growth, however, and no plants died. The asymptomatic seedlings were transplanted to the fields between May 8th and 10th. Mark Hall monitored the plants every three or four days for the next several weeks, as was his custom. Although some looked a little "funny," they were nevertheless "growing like mad." *Record* at 651. On July 5th or 6th, Hall spotted a watermelon blemished by a small purple blotch. By July 15th, the blotch was "spreading like wildfire." *Record* at 662. By harvest time ten days later, a significant portion of the watermelon crop had been ruined.

Hall Farms left most of the blotched Prince Charles watermelons in the fields. They were eventually plowed under in early September in preparation for the planting of oats and then soybeans. Volunteer plants appeared the next summer, but Mark Hall killed them with Blazer, a herbicide, before Dr. Latin could examine them. Hall Farms suffered no watermelon blotch in 1990, even in fields that were infected the year before. During its investigation, Hall Farms learned the Prince Charles variety seeds it planted came from Petoseed's Lot Nos. 1018 and 5024. Lot 1018 was grown in China; lot 5024 was grown in Mexico.

Based on his discussions with Dr. Latin, who was of the opinion the bacteria causing the fruit blotch were introduced into Indiana through the Prince Charles seeds, Hall reasoned the Chinese or Mexican fields must have had the fruit blotch because his plants had it. Petoseed, a part of Hall Farms's argument goes, was therefore culpable to the extent it knew or should have known the fields were infected and yet harvested the seeds of the infected watermelons for sale to businesses like his.

Hall Farms filed a three count complaint against Rispens and Petoseed on October 13, 1989. In addition to its tort claim, Hall Farms alleged Rispens and Petoseed each made and then breached certain express

---

1. "[A] small family corporation[.]" *Brief of Appellee* at 3. "[A] diversified agribusiness corpo-ration[.]" *Brief of Appellant* at 5.

and implied warranties. It sought punitive damages. Rispens and Petoseed moved for summary judgment, but the trial court refused to grant the motion. Rispens and Petoseed now bring this interlocutory appeal challenging that refusal. Other facts will be supplied when necessary.

### Standard of Review

■ This is an appeal from the trial court's refusal to grant summary judgment. The purpose of summary judgment is to end litigation about which there can be no factual dispute and which may be determined as a matter of law. *Kerr v. Carlos* (1991), Ind.App., 582 N.E.2d 860. It is usually inappropriate in negligence cases, which are generally very fact sensitive. *Rubin v. Johnson* (1990), Ind.App., 550 N.E.2d 324, *trans. denied.* Because of its drastic result—the denial of a litigant's day in court—it must be exercised with particular care.

Summary judgment is appropriate only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Moore v. Sitzmark* (1990), Ind. App., 555 N.E.2d 1305, 1307. The party seeking summary judgment bears the burden of establishing the propriety of the motion. *Gaboury v. Ireland Road Grace Brethren, Inc.* (1983), Ind., 446 N.E.2d 1310. When the movant has established a *prima facie* lack of any genuine issue of material fact and entitlement to judgment as a matter of law, it is incumbent upon the non-movant to respond by affidavit or other appropriate evidence setting forth specific facts establishing the existence of a genuine issue in dispute after all. T.R. 56(E); *Keesling v. Baker & Daniels* (1991), Ind.App., 571 N.E.2d 562, *trans. denied.* When considering the propriety of a motion for summary judgment, "[a]ny doubt as to a fact, or an inference to be drawn therefrom, is resolved in favor of the party opposing the motion for summary judgment." *Gaboury, supra.* Despite conflicting facts and inferences on some elements of a claim, summary judgment may be proper when there is no dispute or conflict regarding a fact that is dispositive of the

litigation. *Murphy v. Mellon Accountants Professional Corp.* (1989), Ind.App., 538 N.E.2d 968, *trans. denied.*

On appeal from an order denying summary judgment, the appellate court faces the same issues as those presented to the trial court and must analyze the dispute in the same way. *Oelling v. Rao* (1992), Ind., 593 N.E.2d 189; *Northern Indiana Public Service Co. v. Sell* (1992), Ind.App., 597 N.E.2d 329. The burden of persuasion falls upon the party who lost in the trial court. *Oelling, supra.*

### Overview

Hall Farms has advanced two general theories of liability: contract and tort. We shall address each in turn. After addressing the viability of Hall Farms's theories, we shall turn to perhaps the most significant issue in this litigation, the extent to which Hall Farms may recover damages for the injuries it suffered.

## PART ONE: THEORIES OF LIABILITY

### A. Contract

Hall Farms's contract theory of liability alleges Petoseed and Rispens each breached certain express and implied warranties.

Hall Farms's contract claim against Petoseed and Petoseed's defense to Hall Farms's claim arise from language printed on labels affixed to the one pound cans of the Prince Charles variety seeds. Hall Farms's claim against Rispens and Rispens's defense to Hall Farms's claim grow from language printed on Rispens's order form. In both cases the parties' agreements are wholly in writing; Hall Farms does not rely on any oral representations whatsoever.

#### 1. Express Warranty

■ An express warranty is created by an affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain; it warrants that the goods shall conform to the affirmation or promise. IND.CODE 26–1–2–313(1)(a). "This statute requires some representation, terms or conditions or some definite state-

ment as to how a product is warranted." *Carpetland U.S.A. v. Payne* (1989), Ind. App., 536 N.E.2d 306, 308. It is not necessary to the creation of an express warranty, however, that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty. IND.CODE 26–1–2–313(2). On the other hand, an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty. *Id.*[2] When the parties' agreement is wholly written, the issue of whether certain language in the agreement has created an express warranty is a question of law.

 Whether a given representation is a warranty or merely an expression of the seller's opinion is determined in part by considering "whether the seller asserts a fact of which the buyer is ignorant or merely states an opinion or judgment on a matter of which the seller has no special knowledge and on which the buyer may be expected also to have an opinion and to exercise his judgment." *Royal Business Machines, supra,* at 41. Courts must also consider the degree of specificity expressed in the representation and whether the representation is capable of being conclusively

proven as a fact. Keeping all this in mind, we turn to the specific language upon which Hall Farms relies.

#### a. Petoseed

The label on Petoseed's one pound cans of Prince Charles watermelon seeds states the seeds are "top quality seeds with high vitality, vigor and germination." Hall Farms believes this language created an express warranty, despite other language on the label wherein Petoseed stated "as its sole express warranty, that the seeds it sells will conform to only those descriptions of said seed that are required to be on the label thereof by Federal or applicable State seed law." *Record* at 100.

We first observe the label's plain, unambiguous language states that Petoseed made but one express warranty, that its seeds would conform to applicable labelling requirements. Petoseed clearly intended that no other language on the label be considered an express warranty. We cannot conclusively resolve this issue, however, without examining the substance of the disputed language, for it is entirely possible Petoseed did, in fact, create a second express warranty despite its intentions.

---

**2.** Thus, express warranties were created in the following sample of cases: *Continental Sand & Gravel, Inc. v. K & K Sand & Gravel, Inc.* (7th Cir.1985), 755 F.2d 87 (goods were "in good order, condition, and repair"); *Dessert Seed Co. v. Drew Farmers Supply, Inc.* (1970), 248 Ark. 858, 454 S.W.2d 307 (label stating "Kind and Variety, Tomato—Pink Shipper" was express warranty that contents of package were pink shipper tomatoes); *Hill Aircraft & Leasing Corp. v. Simon* (1970), 122 Ga.App. 524, 177 S.E.2d 803 ("Aero Commander, N–2677B, Number 135, FAA, Flyable" was express warranty that aircraft complied with FAA regulation part 135); *Bell v. Menzies* (1964), 110 Ga.App. 436, 138 S.E.2d 731 (October of 1962 not too late in the year to sprig Zoysia grass); *Rhodes Pharmacal Co. v. Continental Can Co.* (1966), 72 Ill.App.2d 362, 219 N.E.2d 726 ("the use of rustproof linings in the cans would prevent discoloration and adulteration of the Perform solution"); *Wiseman v. Wolfe's Terre Haute Auto Auction, Inc.* (1984), Ind.App., 459 N.E.2d 736 (truck was "road ready"); *Kemp v. Mays* (1920), 73 Ind. App. 214, 127 N.E. 156 ("there is no hog cholera in the county that I know of, and the pigs are all right"); *Wat Henry Pontiac Co. v. Bradley*

(1949), 202 Okl. 82, 210 P.2d 348 (used car salesman stated car was "mechanically perfect").

Conversely, "[g]eneral statements to the effect that goods are 'the best,' or are 'of good quality,' or will 'last a lifetime' and be 'in perfect condition' are generally regarded as expressions of the seller's opinion or 'the puffing of his wares' and do not create an express warranty." *Royal Business Machines, Inc. v. Lorraine Corp.* (7th Cir.1980), 633 F.2d 34, 42 ("high quality" machine parts not an express warranty). *See also Frederickson v. Hackney* (1924), 159 Minn. 234, 198 N.W. 806 (seller's statement that bull calf would "put the buyer on the map" and that "his father was the greatest living dairy bull" was mere puffery); *Hobson Constr. Co., Inc. v. Hajoca Corp.* (1976), 28 N.C.App. 684, 222 S.E.2d 709 (no express warranty created by seller's agent's statement that filter tanks "should be able" to remove iron and manganese from water); *Hupp Corp. v. Metered Washer Service* (1970), 256 Or. 245, 472 P.2d 816 (seller's statement that 'maybe' or 'we think that this might solve your problem' created no express warranty).

#### i. "Top Quality Seeds"

■ We consider the words "top quality seeds" as a classic example of puffery. The precise meaning of "top quality" is subject to considerably different interpretations depending on the varying standards all individuals possess. The phrase contains no degree of specificity. Petoseed's use of the words "top quality seeds" is mere puffery and did not create an express warranty.

#### ii. "With High Vitality, Vigor, and Germination"

■ Like the word "top," the word "high" generally suggests an expression of opinion rather than fact, especially when it serves to modify an equally ambiguous term like "quality." Here, however, Petoseed claimed its seeds possessed "high vitality, vigor, and germination." Although reasonable people may differ as to the particular degree of vitality, vigor, and germination meant by the word "high," it is plain Petoseed did, in fact, expressly warrant that its seeds would possess at least a modicum of vitality, vigor, and germination. If this affirmation became a basis of the bargain, an express warranty was created. IND.CODE 26–1–2–313(1)(a). We need not address this question, however, because even assuming Hall Farms relied on the affirmation, the undisputed facts conclusively demonstrate no breach occurred.

"Vitality" is "the capacity to live, grow, or develop." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1433 (4th printing 1969). "Vigor" is "the capacity for natural growth and survival." *Id.* at 1429. "Germination" is the beginning of growth or sprouting. *Id.* at 553. Here, there is no dispute that the watermelon seeds sprouted, grew, and developed a normal fruit set. Mark Hall testified he transplanted the asymptomatic seedlings between May 8th and 10th. *Record* at 637. He testified that while waiting for Dr. Latin to perform tests on some of the symptomatic seedlings, the remainder were "growing and none of them is a'dying ... [t]hese plants didn't die, these plants kept a'growin." *Record* at 644–45. He testified that as the plants developed, they "were growing good. I mean, you know, they were growing like plants normally grow." *Record* at 648. As the plants reached maturity, Hall was "still never worried because they were growing like mad, they were getting ready to set little fruit and I never worried about it. They went ahead and made normal vine growth, maybe 90 percent of normal vine growth." *Record* at 651. In the end, "the plants never did die." *Record* at 689. Thus, the undisputed facts in this case positively indicate the seeds conformed to affirmation on Petoseed's labels; consequently, there was no breach. Partial summary judgment is appropriate when there is no conflict over facts dispositive of a portion of the litigation. *See Murphy, supra.* Hall Farms may not recover from Petoseed based on an express warranty theory.

#### b. Rispens

#### i. "Strictly High Grade Seeds"

■ Hall Farms's express warranty claim against Rispens is based solely on language found on the purchase order Rispens handed Mark Hall when Rispens delivered the watermelon seeds. Part of that language states that the seeds were "strictly high grade seeds."

The one word in this phrase that might create an express warranty is "grade." A grade can be a general term, simply an unspecified stage or degree in process. On the other hand, a grade can indicate a particular position in a scale of size or quality, as in the examples of grade A eggs, milk, or beef. We lack a detailed knowledge of seed characterization in the watermelon seed business and cannot determine if "strictly high grade seeds" constitutes an express warranty. If watermelon seeds are commonly graded according to some existing scale, a representation that a particular seed was "strictly high grade" would amount to an express warranty that the seed was, in fact, properly included in that grade of seeds. If, however, no such classification system exists, "strictly high grade seeds" would amount to no more

than "top quality seeds," which we have determined to be simple puffery.

Our lack of information naturally gives rise to a question of responsibility. Who should have provided information on the existence of seed grading systems sufficient to allow an informed decision on the matter?

The burden of proving the existence and breach of an express warranty clearly falls upon the party prosecuting the claim. *See* White & Summers *Uniform Commercial Code* § 9–1, at 388 (3rd ed. 1988). Because Hall Farms's claim was that Rispens made and then breached an express warranty that the Prince Charles seeds were "strictly high grade seeds," it was incumbent upon Hall Farms to prove the existence and breach of the express warranty in the first instance. Rispens believed Hall Farms failed to meet this burden and moved for summary judgment; it supported its motion by denying the existence of any material facts concerning grading systems or otherwise. It was then up to Hall Farms to "set forth specific facts showing that there is a genuine issue for trial." T.R. 56(E). This Hall Farms failed to do. It offered nothing to show a seed grading system exists in the watermelon seed industry. It offered no evidence on the word "grade" whatsoever. Hall Farms failed to meet its burden under T.R. 56(C) to set forth specific facts supporting its claim that the phrase "strictly high grade seeds" constitutes an express warranty. The trial court erred in failing to grant summary judgment in Rispens's favor on this issue.

### ii. "Properly Fitted for Seeding Purposes"

■ Hall Farms next points to language on the back of Rispens's order form that states:

> 3. ... [T]he seller agrees to deliver such seeds in good merchantable condition as hereinafter defined and of good germination for the crop of the current year. The phrase "in good merchantable condition" is defined as seeds properly fitted for seeding purposes, by thorough screening, and where necessary by hand picking; approximately free from foreign seeds distinguishable by their appearance.

*Record* at 120. Hall Farms claims that with the language "properly fitted for seeding purposes" Rispens expressly warranted the seeds would be free of disease-causing bacteria and that the seeds would produce marketable melons. Rispens's response is that with this language it promised only that the seeds would be watermelon seeds, free of foreign seeds and other material.

The question here is not whether an express warranty was created, for the parties do not dispute that one was, but rather what was meant by the express warranty. As Rispens submits, "properly fitted for seeding purposes" may mean only that the seeds it sold were watermelon seeds, screened by hand when necessary, and approximately free from foreign seeds. But the phrase may also mean something much more akin to an affirmation that the seeds are proper for growing marketable watermelons. Hall Farms's sole purpose in purchasing the seeds was to grow and then sell watermelons; Rispens knew this. We conclude the phrase "properly fitted for seeding purposes" is susceptible to more than one reasonable interpretation.

It is the duty of courts to ascertain the parties' true intent as expressed in their agreement. *McCae Management Corp. v. Merchants Nat'l Bank and Trust Co. of Indianapolis* (1990), Ind.App., 553 N.E.2d 884, *trans. denied.* In the absence of ambiguity, it is not within a court's imprimatur to look outside the written instrument. *Id.* A contract or a term within a contract is ambiguous if it is susceptible to more than one reasonable interpretation. *Orkin Exterminating Co., Inc. v. Walters* (1984), Ind.App., 466 N.E.2d 55, *trans. denied.* If a contract is ambiguous, a court may consider the circumstances surrounding the agreement's execution, including the parties' situation, their motives in dealing with each other, and the object they sought to accomplish, in order to determine the parties' intent. *Michels v. Dyna–Kote Indus-*

*tries, Inc.* (1986), Ind.App., 497 N.E.2d 586. We therefore remand this issue for trial to ascertain the meaning and context of the phrase "properly fitted for seeding purposes," and to determine whether a breach occurred.

### 2. Implied Warranty

Unless excluded or modified, a warranty that the goods shall be "merchantable," as that term is defined by statute, is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. IND.CODE 26–1–2–314(1). Further, when the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment · to select or furnish suitable goods, the law will impose an implied warranty that the goods shall be fit for that purpose. IND.CODE 26–1–2–315.

But at least as far as implied warranties are concerned, what the law gives it also allows to be removed. IND.CODE 26–1–2–316(2) permits parties to agree to exclude or modify implied warranties if done in a particular manner. To exclude the warranty of merchantability, this section requires the disclaimer mention the word "merchantability" and, if in writing, be conspicuous; to disclaim the warranty of fitness for a particular purpose, the section requires a writing using conspicuous language. Notwithstanding IND.CODE 26–1–2–316(2), implied warranties may also be excluded or limited by employing expressions like "as is" and by courses of dealing, courses of performance, and by usage of trade. IND.CODE 26–1–2–316(3).

#### a. Petoseed

■ Petoseed's label conspicuously stated Petoseed "disclaims, and makes no other warranties, express or implied nor any warranties of merchantability or of fitness for a particular purpose or otherwise." *Record* at 100. Its label also clearly states that "all seeds are sold as is." *Record* at 100. Under IND.CODE 26–1–2–316(3), Petoseed has excluded all implied warranties and consequently may not be held accountable for any alleged breach.

#### b. Rispens

■ Rispens's order form's language differs substantively from Petoseed's. Rispens's order form did not expressly exclude the implied warranties; instead, it stated simply that Rispens "gives no warranties, express or implied, as to the productiveness of any seeds or bulbs it sells. . . ." *Record* at 120.

But as we have observed, implied warranties may be disclaimed or modified through usage of trade. IND.CODE 26–1–2–316(3)(c). A "usage of trade" is "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts." IND.CODE 26–1–1–205(2).

When Rispens filed its motion for summary judgment, it submitted affidavits from Petoseed, Rispens, Knox County Seed Company (another local seed dealer with whom Hall Farms had dealt), and the American Seed Trade Association. These affidavits established that 1) "virtually all seed manufacturers, wholesalers, and distributors disclaim and limit their liability to the purchase price of the seed" and 2) "[t]he custom, practice, and usage of trade in the seed industry has traditionally been and still is to limit liability to the purchase price of the seed. This usage of trade is regularly observed by virtually all seed manufacturers, wholesalers, and distributors." *Record* at 97, 116. With these documents, Rispens presented a *prima facie* case that it had limited its liability and disclaimed the implied warranties by usage of trade.

Hall Farms's response to Rispens's motion for summary judgment did not challenge the existence of an industry-wide practice of disclaimer. Neither did it claim the two businesses with which it dealt did not recognize the disclaimer practice. The failure to challenge an affidavit during a summary judgment proceeding "means that the facts therein are admitted." *Criss v. Bitzegaio* (1981), Ind., 420 N.E.2d 1221, 1224. Instead, Hall Farms's response stat-

ed only that "[Hall Farms] had no reason to be aware of any customs of seed dealers cross [sic] the United States since it primarily dealt with only a couple. Further, it had not in the past had to exert a claim for any damages incurred due to breach of warranty." *Record* at 798. In other words, Hall Farms claims its ignorance prohibits the imposition of the trade usage upon the transaction in question, and, at a minimum, raises a factual question about what it should have known. We disagree.

Once Rispens established the existence of the seed industry's trade usage of disclaiming warranties, it necessarily established a justifiable expectation that the practice would be observed by all doing business with the industry. This is because "trade usage" is defined as "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." IND.CODE 26–1-1-205(2). By conceding the existence of the seed industry's disclaimer practice, Hall Farms necessarily admitted the trade usage justified an expectation of observance with respect to the Hall Farms–Rispens transaction.

As White and Summers instruct their readers, "[n]ote particularly that it is not necessary for both parties to be consciously aware of the trade usage. It is enough if the trade usage is such as to 'justify an expectation' of its observance." *White and Summers* § 3–3, at 122. Further, it is of no moment that Hall Farms may have been an "outsider," because knowledge of trade usage must be imputed to those individuals who undertake business transactions in the industry, be they industry giants or newcomers. "A party need not deal primarily in a trade in order to be charged with knowledge of its customs." *Gord Industrial Plastics, Inc. v. Aubrey Manufacturing, Inc.* (1984), 127 Ill.App.3d 589, 592, 82 Ill.Dec. 855, 858, 469 N.E.2d 389, 392. Because IND.CODE 26–1-1-205(2) plainly emphasizes the degree to which the practice is recognized, not the degree to which a particular party to a transaction is informed about the practice,

and because Hall Farms does not dispute the seed industry's practice of disclaiming, we conclude the Rispens has disclaimed its implied warranties by usage of trade. The trial court improperly refused to enter summary judgment for Rispens on this issue.

### Conclusion: Contract Theory

Hall Farms's entire contract theory against Petoseed fails, as does Hall Farms's implied warranty theory against Rispens. We instruct the trial court to grant summary judgment to Petoseed and Rispens on these issues. Hall Farms may pursue its breach of express warranty claim against Rispens, if, on remand, the trial court determines the phrase "properly fitted for seeding purposes" comports with Hall Farms's interpretation and not with Rispens's.

### B. Tort

The next major topic we must address concerns the extent to which Hall Farms may pursue its recovery under a tort theory. Hall Farms has arguably advanced a strict product liability theory, a negligence-based product liability theory, and a common law negligence theory against both Petoseed and Rispens.

The evidence Hall Farms submitted in response to the motion for summary judgment centered entirely on Petoseed's alleged culpability. Hall Farms has submitted nothing to support its claim that Rispens was somehow liable in tort. We therefore reverse the trial court's decision to withhold summary judgment in Rispens's favor on Hall Farms's tort claim and devote the remainder of this discussion to Hall Farms's claim against Petoseed.

#### 1. Strict Product Liability

Indiana's Product Liability Act as it stands now "governs all actions in which the theory of liability is strict liability in tort." IND.CODE 33–1-1.5-1. It subjects sellers of unreasonably dangerous defective products to strict liability for physical harm caused by that product to the user or consumer or to his property. IND.CODE

33–1–1.5–3(a). "Physical harm" is defined as "bodily injury, death, loss of services, and rights arising from such injuries, as well as sudden, major damage to property. The term does not include gradually evolving damage to property or economic loss from such damage." IND.CODE 33–1–1.5–2. Petoseed argues the Act's definition of "physical harm" defeats Hall Farms's strict product liability theory because, as a matter of law, the damage to the watermelon crop was not sudden.

■ When interpreting statutes, we endeavor to give words their plain and ordinary meaning unless some contrary purpose is clearly shown. *Marion County Sheriff's Merit Bd. v. Peoples Broadcasting Co.* (1989), Ind., 547 N.E.2d 235; *Smithhart v. State* (1992), Ind.App., 591 N.E.2d 149. In common understanding, the word "sudden" denotes a sense of promptness or abruptness. AMERICAN HERITAGE DICTIONARY at 1268.

■ The determination of whether damage is "sudden" will necessarily depend on the unique facts of each controversy, and will ordinarily be resolved by the trier of fact. We also agree that in making this determination, factors such as the nature of the defect, the type of the risk, and the manner in which the injury arose should be considered. *Mac's Eggs, Inc. v. Rite–Way Agri Distributors* (N.D.Ind.1987), 656 F.Supp. 720 (citing *Pennsylvania Glass Sand Corp. v. Catepillar Tractor Co.* (3rd Cir.1981), 652 F.2d 1165). The facts here are not so one-sided as for us to be able to say, as a matter of law, that Hall Farms's damage was or was not sudden. Resolution of this issue is properly left for the factfinder. The trial court did not err in refusing to grant summary judgment on Hall Farms's strict liability claim against Petoseed.

## 2. Negligence

It is appropriate to recall at this point that Hall Farms's essential contention is that the mechanism causing the fruit blotch was present in the seeds when Hall Farms purchased them. Therefore, the argument goes, the parent fields must have been infected with the blotch because Hall Farms's fields were infected. If the parent field was infected, Hall Farms claims, Petoseed is culpable for selling seeds from infected melons to Hall Farms.

Hall Farms's common law negligence theory and its negligence-based product liability theory both share the requirement that Hall Farms adequately allege and support a claim of culpability on Petoseed's part. Petoseed contends Hall Farms has failed in its burden of supporting its claims under the trial rules.

■ A party opposing a motion for summary judgment must "designate to the court all parts of pleadings, depositions, answers to interrogatories, admissions, matters of judicial notice, and any other matters on which it relies for purposes of the motion." T.R. 56(C). In addition to this specification, a party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." T.R. 56(E). The rule imposes the added requirement of setting forth facts "as would be admissible in evidence." *Id.* This additional demand requires the trial court to exclude all inadmissible evidence when it considers the propriety of the motion. *Burke v. Capello* (1988), Ind., 520 N.E.2d 439.

■ Hall Farms supported its response to the motion for summary judgment with excerpts from four purported depositions, excerpts from a Petoseed quality assurance manual, a release of liability, and two photographs. Although the latter three categories of evidence have no probative value on the issue of Petoseed's culpability, the purported deposition testimony of Dr. Latin, the plant pathologist, seems to raise a genuine issue of material fact regarding Petoseed's culpability. As submitted, however, Dr. Latin's assertions, purporting to be from his deposition testimony, are inadmissible because they are unauthenticated.

T.R. 30, which regulates the use of depositions taken upon oral examination, requires a certification "that the witness was duly sworn by [the officer] and that the deposition is a true record of testimony given by the witness." Three of the four depositions from which Hall Farms derived the excerpts had not previously been published with the trial court and the excerpts themselves lacked the certification required by T.R. 30(F). There was no evidence the deponents were sworn or that the excerpts accurately reflected the testimony that was supposedly given. With one exception, the evidence Hall Farms submitted supporting its negligence-based tort theory was inadmissible because it was not foundationally sound. The trial court erred to the extent it considered unauthenticated evidence.

■ That "one exception" is Mark Hall's deposition, which, unlike its counterparts, was both published with the trial court and properly certified under T.R. 30(F) before Hall Farms submitted its response to the summary judgment motion.[3] We turn, then, to the Hall deposition to determine whether it raises a genuine issue for trial.

Although Hall admitted he had no direct evidence on the matter of Petoseed's culpability, he testified that "if [the disease] was in the seed it was in the seed field." *Record* at 827. He suggested that "whoever was in charge of harvesting that field should have watched the melons closer." *Record* at 828. Finally, he opined that "this is just my opinion, this is my opinion—[Petoseed] didn't have strict enough quality controls on their harvesting crew...." *Record* at 829.

■ Even assuming Hall was an expert on these matters, without specific supporting facts his opinions are not admissible. Although we do not require expert opinions to be expressed with a particular degree of certainty, *Noblesville Casting Div. of TRW, Inc. v. Prince* (1982), Ind., 438 N.E.2d 722, the expression of mere possibilities will not suffice to place a fact in issue. *Id.* Conclusory allegations without specific supporting facts have no probative value. *Evers v. General Motors Corp* (11th Cir. 1985), 770 F.2d 984. "A party cannot create a genuine issue of fact merely by presenting an expert witness who is willing to express an unsupported opinion that favors the party's position." *Porter v. Whitehall Laboratories* (S.D.Ind.1992), 791 F.Supp. 1335, 1347 (citing *Merit Motors, Inc. v. Chrysler Corp.* (D.C.Cir.1977), 569 F.2d 666 (Wright, J.)). Here, there is nothing in the Hall excerpt to support the bald opinions Hall advanced, and therefore nothing to support the existence of a genuine issue of material fact. The trial court erred by refusing to enter summary judgment in Petoseed's favor on Hall Farms's negligence-based tort theories.

### Conclusion: Tort Theory

The trial court erred in failing to grant summary judgment in Rispens's favor on all of Hall Farms's tort claims. It correctly refused to grant summary judgment in Petoseed's favor on Hall Farms's strict product liability theory, but incorrectly refused to grant summary judgment in Petoseed's favor on Hall Farms's negligence-based tort theories.

### PART TWO: DAMAGES

Having concluded Hall Farms has advanced viable theories of recovery against both Petoseed and Rispens, we turn to the

---

**3.** Thus, a party supporting or defending a summary judgment motion who wishes to rely on a deposition in whole or in part would be well-advised to proceed in one of two ways. First, and probably more efficiently, the party could initially publish the entire, properly certified deposition by filing it with the trial court; under T.R. 5(D)(5), depositions may be published by filing them with the trial court. After the deposition has been properly published, the party could then attach any excerpts from the deposition to its summary judgment arguments without further foundational concern. Of course, the excerpts may be inadmissible for other reasons (for example, if they consisted of inadmissible hearsay or were not timely filed). Alternatively, a party may publish the excerpts for the first time when it argues in support or defense of the summary judgment motion, so long as the excerpts are accompanied by the proper certification. At a minimum, however, the proposed evidence must always meet the basic foundational requirements, whatever those requirements happen to be.

issue regarding the extent to which Hall Farms may recover damages from Petoseed and Rispens even if liability is ultimately established.

Petoseed's and Rispens's primary response to the question of damages is that no matter what each may have done or not done, Hall Farms agreed to limit Petoseed's and Rispens's liability to the purchase price of the Prince Charles seeds when Hall Farms bought the seeds. If Petoseed and Rispens are correct, Hall Farms's possible recovery drops from over $180,000 to less than $4,000. Because this litigation stems from a buyer's dissatisfaction with a purchased product, it is governed in large part by the sales provisions of the Uniform Commercial Code.[4]

## A. The Written Limitation of Liability

■ The Uniform Commercial Code expressly allows parties to agree to a contractual modification or limitation of remedy in the event of the agreement's breach. IND. CODE 26–1–2–719. A modification of warranty eliminates the requirement that the goods possess a certain measure of quality, whereas a limitation of remedy acknowledges the quality commitment by restricting the remedy available once a breach has been established. *Hahn v. Ford Motor Co.* (1982), Ind.App., 434 N.E.2d 943. The agreement may limit the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts. IND. CODE 26–1–2–719(1)(a). The agreement may also limit or totally exclude consequential damages so long as the limitation or exclusion is conscionable. IND.CODE 26–1–2–719(3). For reasons of public policy, however, Indiana law does not favor limitations of remedy; when the limitations are ambiguous and must be construed, they are strictly construed against the party who created them. *Hahn, supra.*

■ It is our task, then, to evaluate the limitations of liability appearing on the Pe-

toseed label and on Rispens's order form. In so doing, we employ standard principles of contract law. For example, "[w]hen a matter is expressly covered by a written instrument, the unambiguous provisions of that instrument control and the intent of the parties will be determined from within the 'four corners' of the instrument." *Orkin Exterminating Co., supra.* As we have written earlier, a contract is "ambiguous" if a reasonable person finds the contract subject to more than one interpretation. *Id.* "If the parties' intention is discernible from the written contract and the unambiguous terms of the contract are conclusive regarding the parties' intentions, absent claims of a defect in the contract's formation, then the court must give it effect." *Id.* In other words, when the agreement's terms are clear and the parties' intentions apparent, the court will require the parties to perform consistently with the bargain struck. *First Federal Savings Bank of Indiana v. Key Markets, Inc.* (1990), Ind., 559 N.E.2d 600. Finally, we repeat the important principle that parties to a contract possess broad latitude within which they may fashion their own liabilities and remedies. *Hahn, supra.*

Here, Hall Farms does not argue it did not enter into binding agreements with Petoseed and Rispens so much as it insists the agreement is ambiguous, ineffective, and unconscionable. We examine these contentions in turn.

### 1. Ambiguity

■ Petoseed and Rispens both assert their respective agreements with Hall Farms unambiguously limited Hall Farms's ability to recover damages arising from the appearance of the fruit blotch.

The Petoseed label states, in part:

NOTICE TO PURCHASER

Regarding Liability

\* \* \* \* \* \*

2. LIMITATION OF LIABILITY: Purchaser's exclusive compensation for loss

---

4. IND.CODE 26–1–1–101 *et seq.* The parties do not dispute the fact that because watermelon seeds are "goods" as the term is defined in IND.CODE 26–1–2–105(1), the parties' transaction is governed by the code's sales provisions. *See, e.g., Stumler v. Ferry–Morse Seed Co.* (7th Cir.1981), 644 F.2d 667 (sale of tomato seeds is sale of "goods").

or damage arising from purchase or use of seed from Petoseed Co., Inc., shall be limited to an amount equal to the purchase price of the seed. There shall not be included any amount for incidental or consequential damages, nor for amounts expended in using or growing such seed, nor for harvesting the produce of such seed. This limitation of liability shall be applicable to any claims presented to Petoseed, regardless of the legal theory forming the basis of such claim, and whether such theory involves negligence, contractual liability or otherwise.

*Record* at 100.[5]

The language on Rispens's order form reads, in part:

11. Except as herein otherwise expressly provided, the seller, Martin Rispens & Son, Inc., gives no warranty, express or implied, as to the productiveness of any seeds or bulbs it sells and will not be in any way be responsible for the crop. Our liability, in all instances, is limited to the purchase price of the seed.

*Record* at 120.

Petoseed's and Rispens's intent to limit their liability to the purchase price of the seed is plain. The language each writing employed is unequivocal. Hall Farms does not claim it had no reasonable opportunity to read Petoseed's label and Rispens's order form; neither does it deny it did not assent to this language when it purchased the seeds or that had it read the writing, it would not have purchased the product. We must conclude the two agreements reflect the parties' intentions to limit recovery in all cases to the purchase price of the seed. *See Id.* at 949 (car buyer whose attention was not directed to specific warranty limitations contained in manufacturer's booklet until after the purchase and who was not afforded reasonable opportunity to read the booklet did not assent to the remedy limitation). Although we. ac-

knowledge Mark Hall's testimony stating he did not read Rispens's order form, this fact alone cannot alter our ultimate conclusion that the label and the order form unambiguously reflected the parties' agreements. The failure to read a contract—even a standard form contract—does not render the terms therein unenforceable.

2. Effectiveness

When our General Assembly adopted its version of the Uniform Commercial Code, it expressly chose to permit sellers to limit remedies for breach of contract. *See* IND. CODE 26–1–2–316(4); IND.CODE 26–1–2–719. As mentioned, however, the parties' ability to fashion their own remedies is not boundless. Our General Assembly has provided that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in I[ND.] C[ODE] 26–1." IND. CODE 26–1–2–719(2). It also condemned "unconscionable" limitations on consequential damages. IND.CODE 26–1–2–719(3). Hall Farms contends Petoseed's and Rispens's limitations of remedy violate the law.

a. Failure of Essential Purpose

IND.CODE 26–1–2–719(2) states that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act."

The official comment 1 to IND.CODE 26–1–2–719 advises that

Under this section parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect.

However, it is of the very essence of a sales contract that at least minimum adequate remedies be available.... [T]hey must accept the legal consequence that there be at least a fair quantum or reme-

---

5. The label also states California law should govern the resolution of disputes over the product. California has adopted the UCC (Cal.Com. Code § 1101 *et seq.*) and neither party has raised any conflict of law issue. Accordingly, Indiana law governs. *See* T.R. 44.1(B); *Harvest Insurance Agency v. Inter–Ocean Insurance*

*Agency* (1986), Ind., 492 N.E.2d 686, 691 ("It is well established in Indiana that if the law of another state is not pleaded and no steps are taken to require the court to take judicial notice of the law ... the court will presume the law in that jurisdiction is substantially the same as the law in Indiana").

dy for breach of the obligations or duties outlined in the contract. Under subsection (2), where an apparently fair and reasonable clause fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this article.

"To use the words of Professor Honnold, [the failure of the essential purpose] provision 'is not concerned with arrangements which were oppressive at the inception, but rather with the application of an agreement to novel circumstances not contemplated by the parties.'" White & Summers, § 12–10 at 523.

We dismiss Hall Farms's contention that the "novel circumstance not contemplated by the parties" was the presence of fruit blotch bacteria in the seeds. Rather, Petoseed and Rispens plainly anticipated the possibility of claims arising from defective seeds. The limitation did not leave Hall Farms without a minimum adequate remedy, for Hall Farms may still be able to recover the seeds' purchase price. Finally, Hall Farms's analysis "would turn the provision on its head since it would always prevent imposition of any limitation that might prevent recovery of the particular relief sought." *Hill v. BASF Wyandotte Corp.* (4th Cir.1982), 696 F.2d 287, 292. We find that Petoseed's and Rispens's limitation of recovery to purchase price does not defeat the limitation's essential purpose.

### b. Unconscionability

▮ The question of unconscionability is one exclusively for the courts. IND. CODE 26–1–2–302(1). The party raising the issue bears the burden of proof. *Hahn, supra.* The limitation of damages where the loss is commercial is not *prima facie* unconscionable. IND.CODE 26–1–2–719(3). Official comment 1 to IND.CODE 26–1–2–302 presents the "basic test" as:

whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the

contract ... the principle is one of the prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior bargaining power.

"This analysis concentrates upon the two branches of unconscionability: substantive and procedural. Substantive unconscionability refers to oppressively one-sided and harsh terms of a contract, while procedural unconscionability involves the manner and process by which the terms become part of the contract." *Hahn, supra,* at 951.

#### i. Substantive

Petoseed's and Rispens's limitation of remedy to the purchase price of the seed is not substantively unconscionable. The limitation is not oppressively harsh and one-sided. Like many other commercial ventures, farming is an inherently risky business and someone must bear the risk of loss. As shown later, the limitation at issue is nearly universal in the seed industry because of the large number of factors that can adversely affect a seed's performance: too much or too little rainfall, temperature extremes, insects, diseases, chemicals, and soil conditions, to name but a few. Neither Petoseed nor Rispens agreed to become an absolute guarantor of Hall Farms's watermelon crop in the event the seed failed to perform as expected or for any other reason. In fact, Petoseed and Rispens conditioned their sale on *not* being held responsible for such calamity. The limitation of recovery to the purchase price is not substantively unconscionable.

#### ii. Procedural

Procedural unconscionability issues very often arise from the bargaining process, as seen in *Industralease Automated & Scientific Equipment Corp. v. R.M.E. Enterprises, Inc.* (1977), 396 N.Y.S.2d 427, 58 A.D.2d 482 (atmosphere of haste and pressure), or from characteristics peculiar to the consumer, as illustrated in *Williams v. Walker–Thomas Furniture Co.* (D.C.Cir. 1965), 350 F.2d 445 (naive welfare mother) and *Jefferson Credit Corp. v. Marcano* (1969), 60 Misc.2d 138, 302 N.Y.S.2d 390

**444**

(buyer with poor command of English language). *See generally White & Summers* § 4–3, at 184. Here, other than asserting that Mark Hall did not read the labels and order form, Hall Farms has not argued procedural unconscionability. Indeed, Hall Farms bases its entire breach of contract claim on other provisions within the agreement. The limitation of recovery to the purchase price is not procedurally unconscionable.

Petoseed's and Rispens's limitations of liability are enforceable.

### B. Punitive Damages

 Finally, Petoseed contends the trial court erred by refusing to grant summary judgment in its favor on Hall Farms's claim for punitive damages.

A party defending a punitive damages claim "is cloaked with the presumption that his actions, though tortious, were nevertheless noniniquitous human failings, *i.e.* that he is *not guilty of the quasi-crime alleged.* Were it otherwise, there would be no restraint upon the award of punitive damages upon conflicting inferences." *Orkin Exterminating Co. v. Traina* (1986), Ind., 486 N.E.2d 1019, 1023 (original emphasis). Moreover,

> [P]unitive damages should not be allowable upon evidence that is merely consistent with the hypothesis of malice, fraud, gross negligence or oppressiveness. Rather some evidence should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other such noniniquitous human failing.

*Travelers Indemnity Co. v. Armstrong* (1982), Ind., 442 N.E.2d 349, 362.

Here, Hall Farms tendered nothing to overcome the "presumption of innocence" in Petoseed's favor. It submitted no evidence inconsistent with the hypothesis that the allegedly tortious conduct was also the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence, or some other noniniquitous human failing. To the contrary, at the sum-

mary judgment hearing Hall Farms admitted it submitted no supporting evidence: "[s]o far as punitive damage, Judge, we didn't present any evidence at this point on punitive damages...." *Record* at 1049–50. The trial court erred in refusing to grant summary judgment to Petoseed (and Rispens) on Hall Farms's punitive damage claim.

### Conclusion: Damages

Petoseed's and Rispens's limitation of remedy to the recovery of the purchase price of the seed is enforceable. Under all theories of liability, Hall Farms may not recover damages from either Petoseed or Rispens other than those associated with the cost of the Prince Charles seeds. Further, the trial court erred in failing to grant summary judgment to Petoseed and Rispens on the punitive damages issue.

### DECISION

Hall Farms's recovery is limited to recoupment of the Prince Charles seeds' purchase price. Hall Farms may attempt to recover the seeds' purchase price from Petoseed only on its strict product liability tort theory. It may attempt to recover the seeds' purchase price from Rispens only on a breach of express warranty theory.

The trial court erred in failing to grant summary judgment to Petoseed on the entirety of Hall Farms's contract theory and to Rispens on Hall Farms's tort theory and implied warranty theory. It erred when it refused to terminate Hall Farms's punitive damages claim. The trial court correctly refused to grant summary on Petoseed's strict product liability tort defense and on Rispens's express warranty defense. The cause is remanded to the trial court to enter summary judgment as indicated and to proceed to trial on Hall Farms's viable theories.

RATLIFF and HOFFMAN, JJ., concur.